103 F.3d 273
 UNITED STATES of America
v.
Raymond RYBAR, Jr., Appellant.
 No. 95-3185.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 13, 1995.
Decided Dec. 30, 1996.
 
 James H. Jeffries, III (argued), Greensboro, NC, for Appellant.
 Bonnie R. Schlueter, Mary Beth Buchanan (argued), Office of United States Attorney, Pittsburgh, PA, for Appellee.
 Before: SLOVITER, Chief Judge, and ALITO, Circuit Judge, and RENDELL, District Judge.*
 OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 
 1
 Appellant Raymond Rybar, Jr. was convicted following a conditional guilty plea to two counts of violating 18 U.S.C. § 922(o), which makes it "unlawful for any person to transfer or possess a machinegun." On appeal, he argues that the district court erred in rejecting his challenge to that provision as beyond Congress' commerce power and as violating the Second Amendment. Neither challenge is persuasive. Every court of appeals that has considered a challenge to § 922(o) under the Commerce Clause has upheld the constitutionality of the provision. See United States v. Beuckelaere, 91 F.3d 781 (6th Cir.1996); United States v. Kenney, 91 F.3d 884 (7th Cir.1996); United States v. Rambo, 74 F.3d 948 (9th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); United States v. Kirk, 70 F.3d 791 (5th Cir.1995)[1]; United States v. Wilks, 58 F.3d 1518 (10th Cir.1995); United States v. Pearson, 8 F.3d 631 (8th Cir.1993), cert. denied, 511 U.S. 1126, 114 S.Ct. 2132, 128 L.Ed.2d 863 (1994). Nor has Rybar presented any authority in support of his Second Amendment argument. We examine each claim in turn.I.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 On April 4, 1992, Rybar, a federally licensed firearms dealer, attended a gun show in Monroeville, Pennsylvania, and had in his possession a Chinese Type 54, 7.62-millimeter submachine gun, serial number 2052272, which he offered to sell to Thomas Baublitz, who paid him and to whom he transferred possession. The next day, April 5, 1992, Rybar again visited the Monroeville gun show, this time in possession of a U.S. Military M-3, .45 caliber submachine gun, serial number 216831, which he offered to sell to Baublitz, who paid him for it and to whom he transferred possession.
 
 
 3
 A grand jury indicted Rybar on two counts of unlawful possession of a machine gun in violation of 18 U.S.C. § 922(o)(1) (Counts I and III), and two counts of unlawful transfer of an unregistered firearm in violation of 26 U.S.C. § 5861(e) (Counts II and IV). Rybar moved to dismiss the indictment on the ground that both statutes were unconstitutional. While the motion was pending, the court was informed that Rybar was prepared to plead guilty.
 
 
 4
 At the hearing on the change of plea, the district court first ruled on the pending motion. The court granted the motion to dismiss Counts II and IV. The court held that insofar as 26 U.S.C. § 5861(e) criminalizes the transfer of an unregistered machine gun, it is unconstitutional because
 
 
 5
 [a]fter Congress enacted Title 18 of the United States Code Section 922(o), registration of machine guns is no longer possible. Thus defendant has been charged in the indictment with failing to perform an act, registration of two machine guns, that is prohibited by law. This violates notions of fundamental fairness as guaranteed by the Due Process Clause of the Fifth Amendment. Further, this Court finds that Section 5861(e) is no longer a valid taxing statute with respect to machine guns, because the government currently does not register and tax such machine guns.
 
 App. at 16-17.[2]
 
 6
 The court denied Rybar's motion to dismiss Counts I and III. The court held that § 922(o) was "a valid exercise of the authority granted to Congress under the Commerce Clause" and was compatible with Second Amendment protections "because this defendant's possession of a machine gun was not reasonably related to the preservation or efficiency of a well-regulated militia." App. at 16.
 
 
 7
 The court then proceeded to the change of plea portion of the hearing. After the court fully informed Rybar of his rights, Rybar agreed to the facts as summarized by the government, i.e., that he approached Baublitz on both occasions and offered to sell him the machine guns described, and that Baublitz paid him on both occasions and took the machine guns. Rybar corrected the prosecution's statement that he received a total of $1,300 for the machine guns, and stated instead that he received a total of $600 for both machine guns. App. at 31-32 (Hearing Transcript, Jan. 9, 1995).
 
 
 8
 Rybar had agreed to plead guilty to all four counts of the indictment, i.e., the two counts of possession and the two counts of transfer of an unregistered machine gun, and although the court had just dismissed Counts II and IV, Rybar attested to the entire agreement at the court's request. Id. at 27-29. Rybar then entered a conditional guilty plea to the two remaining counts, preserving for appeal the disputed constitutionality of 18 U.S.C. § 922(o). At the sentencing hearing several months later, the district court sentenced Rybar to eighteen months imprisonment, the minimum sentence under the applicable guideline range, ordered three years of supervised release to follow, and imposed a special assessment of $100.00.
 
 
 9
 The district court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of a district court's determination of the constitutionality of a statute is plenary. Dyszel v. Marks, 6 F.3d 116, 123 (3d Cir.1993).
 
 II.
 DISCUSSION
 In its entirety, § 922(o) reads:
 
 10
 (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
 
 
 11
 (2) This subsection does not apply with respect to--
 
 
 12
 (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
 
 
 13
 (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.
 
 
 14
 18 U.S.C. § 922(o) (1994).
 
 
 15
 "Machinegun," in turn, is defined in 26 U.S.C. § 5845(b), part of the National Firearms Act, as
 
 
 16
 any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.
 
 
 17
 See 18 U.S.C. § 921(a)(23) (1994).
 
 
 18
 The statute prohibits only those instances of possession and transfer of machine guns not lawfully possessed before its enactment date--May 19, 1986; machine guns lawfully possessed before that date are left unaffected. See 18 U.S.C. § 922(o)(2)(B) (1994); Pub.L. No. 99-308 § 110(c), 100 Stat. 449, 461 (1986).
 
 
 19
 As in the district court, Rybar urges the unconstitutionality of § 922(o) on two grounds. He argues: (1) that the provision outstrips Congress' regulatory authority under the Commerce Clause and (2) that it offends his Second Amendment right "to keep and bear arms."
 
 A.
 Commerce Clause
 
 20
 Rybar relies primarily on the Supreme Court's recent opinion in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in support of his Commerce Clause challenge. In Lopez, the Court invalidated the Gun-Free School Zones Act of 1990, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A) (1994). A "school zone" was defined as "in, or on the ground of, a ... school" or "within a distance of 1,000 feet." 18 U.S.C. § 921(a)(25) (1994). The decision generated six separate opinions, with five justices supporting the Court's holding that the statute exceeded Congress' authority under the Commerce Clause.
 
 
 21
 On behalf of the majority, Chief Justice Rehnquist reviewed the Court's Commerce Clause decisions dealing with the extent of Congress' power, stating that § 922(q) "neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce." 514 U.S. at ----, 115 S.Ct. at 1626. In summarizing the earlier cases, he observed that in Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359-60, 28 L.Ed.2d 686 (1971), the Court had identified three broad categories of activity that Congress may regulate under its commerce power: (1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and (3) those activities "that substantially affect interstate commerce." Id., 514 U.S. at ---- - ----, 115 S.Ct. at 1629-30.
 
 
 22
 He quickly disposed of the first two categories as inapplicable to § 922(q), and stated that if that statute were to be sustained it would have to be as a regulation of an activity that substantially affects interstate commerce. It failed that test because "by its terms" the statute prohibiting possession of a gun in a school zone had "nothing to do with 'commerce' or any sort of economic enterprise," id. at ---- - ----, 115 S.Ct. at 1630-31, nor was it "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Id. at ----, 115 S.Ct. at 1631. Furthermore, § 922(q) contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." Id.
 
 
 23
 Justice Kennedy, joined by Justice O'Connor, concurred, outlining what they perceived as the majority's "necessary though limited holding." Id. at ----, 115 S.Ct. at 1634 (Kennedy, J., concurring). From his survey of the Supreme Court's efforts to chart the limits of the Commerce Clause, Justice Kennedy extracted two relevant "lessons" from the past decisions: the inadequacy of using "content-based distinctions," such as that between "direct" and "indirect" effects on commerce, to define those limits, and the importance of maintaining the "practical conception" of the commerce power that had been forged out of the Court's precedents. Id. at ----, 115 S.Ct. at 1637. Most significantly, Justice Kennedy observed that where an enactment under the Commerce Clause bears only a tenuous connection to commerce, courts should inquire whether it "seeks to intrude upon an area of traditional state concern." Id. at ----, 115 S.Ct. at 1640. Justice Kennedy went on to observe that "here neither the actors nor their conduct have a commercial character, and neither the purposes nor the design of the statute have an evident commercial nexus." Id. at ----, 115 S.Ct. at 1640. He was concerned that § 922(q) foreclosed states from crafting independent solutions to the guns-in-schools problem, id. at ----, 115 S.Ct. at 1641, and concluded that, "[a]bsent a stronger connection or identification with commercial concerns," § 922(q)'s intrusion into education "contradict[ed] the federal balance" and was therefore invalid. Id. at ----, 115 S.Ct. at 1642. Justice Thomas also filed a separate concurrence.
 
 
 24
 The principal opinion for the four dissenters was authored by Justice Breyer, who emphasized the following three basic principles: (1) local activities may be regulated under the Commerce Clause where they "significantly affect interstate commerce"; (2) these local activities must be considered cumulatively in viewing their effect on interstate commerce; and (3) the court's inquiry is limited to whether Congress could have had a rational basis for concluding the regulated activity sufficiently affected interstate commerce. Id. at ---- - ----, 115 S.Ct. at 1657-58 (Breyer, J., dissenting). He stated, inter alia, that Congress could have had a rational basis for concluding that the "widespread" and "extremely serious" problem of guns in and around schools had a substantial effect on interstate and foreign commerce because it "significantly undermines the quality of education in our Nation's classrooms," id. at ----, 115 S.Ct. at 1659, thereby reducing the pool of skilled workers available to businesses, diminishing industrial productivity, and eroding global competitiveness. Id. at ---- - ----, 115 S.Ct. at 1659-61.
 
 
 25
 Justices Stevens and Souter, both of whom joined Justice Breyer's dissent, each wrote separately as well. Justice Stevens emphasized the multiple links he perceived between firearms possession in schools and interstate commerce. Id. at ----, 115 S.Ct. at 1651. Justice Souter emphasized the highly deferential judicial review in Commerce Clause cases, criticized as "highly formalistic" the Court's early conceptions of "commerce," and analogized the majority's insistent distinction between "commercial" and "noncommercial" activity to the Court's Lochner era substantive due process approach. Id. at ---- - ----, 115 S.Ct. at 1651-54.
 
 
 26
 Rybar forwards all of the reasons given by the Lopez majority, many in haec verba, as equally determinative of the invalidity of Congress' prohibition of machine guns. He contends that § 922(o)'s proscription of machine gun transfer and possession can be upheld only as regulation of an "activit[y] that substantially affect[s] interstate commerce." Brief of Appellant at 14 (quoting Lopez, 514 U.S. at ----, 115 S.Ct. at 1630). He argues that § 922(o) fails this "substantial effect" test, since its attempt to reach mere intrastate gun possession has only the most tenuous links to interstate commerce and would blur past any principled limit on the commerce power. Finally, Rybar invokes the same federalism concerns expressed in Lopez, arguing that Pennsylvania's own regime of machine gun regulation makes relevant the Court's observation in Lopez that "[s]tates possess primary authority for defining and enforcing the criminal law." Id. at ---- n. 3, 115 S.Ct. at 1631 n. 3 (quoting Brecht v. Abrahamson, 507 U.S. 619, 635, 113 S.Ct. 1710, 1720-21, 123 L.Ed.2d 353 (1993)).
 
 
 27
 Before we examine the particular statute at issue here, it may be helpful to set forth the principles governing the standards by which we review such a challenge. As Justice Kennedy observed in his concurrence in Lopez, while Congress enjoys "extensive power and ample discretion to determine [the] appropriate exercise [of its Commerce Clause authority]," the courts, for their part, must observe "great restraint" before determining "that the Clause is insufficient to support an exercise of the national power." Id. at ----, 115 S.Ct. at 1634 (Kennedy, J., concurring). Our examination of the scope of legislative prerogative respecting exercise of the Commerce Clause power is twofold, and "relatively narrow." Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). We must first determine whether Congress could rationally conclude that the regulated activity substantially affects interstate commerce. Lopez, 514 U.S. at ---- - ----, 115 S.Ct. at 1629-30.[3] If we decide that it could, "the only remaining question for judicial inquiry is whether 'the means chosen by [Congress] [are] reasonably adapted to the end permitted by the Constitution.' " Virginia Surface Mining, 452 U.S. at 276, 101 S.Ct. at 2360 (quoting Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964)); accord Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 17, 110 S.Ct. 914, 924-25, 108 L.Ed.2d 1 (1990).
 
 
 28
 In Lopez the government had conceded that neither § 922(q) nor its legislative history contained any express findings regarding the effects on interstate commerce of gun possession in a school zone. 514 U.S. at ----, 115 S.Ct. at 1631. Chief Justice Rehnquist commented that the Court's ability to evaluate the legislative judgment as to the effect of gun possession on interstate commerce would have been aided by the existence of congressional findings, and declined to consider findings accompanying prior firearms legislation because the previous legislation did not address the subject matter of § 922(q) or its relationship to interstate commerce. The prohibition of firearm possession in a school zone effected by § 922(q) " 'plow[ed] thoroughly new ground and represent[ed] a sharp break with the longstanding pattern of federal firearms legislation.' " Id. at ----, 115 S.Ct. at 1632 (quoting approvingly from the Court of Appeals decision).
 
 
 29
 The majority thus proceeded to determine, without the aid of Congress' views, whether possession of a firearm in a school zone does in fact substantially affect interstate commerce. The government had argued that such possession may result in violent crime, which can be expected to affect the national economy in two ways: (1) the costs of violent crime are spread throughout the population through the mechanism of insurance; and (2) violent crime reduces the willingness of people to travel to unsafe areas. The government had also contended that the presence of guns in schools threatens the learning environment, resulting in a less productive citizenry and adverse effects on the nation's economic well-being. Id.
 
 
 30
 The Lopez majority rejected these arguments because it saw no boundaries, commenting that under the government's theories it would be "difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign." Id. In response to Justice Breyer's dissent, which argued that "Congress ... could rationally conclude that schools fall on the commercial side of the line," id. at ----, 115 S.Ct. at 1664 (Breyer, J., dissenting), Chief Justice Rehnquist characterized such analysis as "equally applicable, if not more so, to subjects such as family law and direct regulation of education," id. at ----, 115 S.Ct. at 1633. He continued,
 
 
 31
 We do not doubt that Congress has authority under the Commerce Clause to regulate numerous commercial activities that substantially affect interstate commerce and also affect the educational process. That authority, though broad, does not include the authority to regulate each and every aspect of local schools.
 
 Id. He added:
 
 32
 The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce.
 
 
 33
 Id. at ----, 115 S.Ct. at 1634. The Chief Justice concluded by declining "to pile inference upon inference" in order "to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." Id.
 
 
 34
 Nonetheless, the Lopez majority emphasized that "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." Id. at ----, 115 S.Ct. at 1631. The Court commented only that such findings might have special relevance where they would aid judicial evaluation of "the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye." Id. at ----, 115 S.Ct. at 1632.
 
 
 35
 In any event, in our analysis of § 922(o) we find that, unlike the situation in Lopez, there are legislative findings to aid judicial evaluation of the effect of machine guns on interstate commerce. While these findings did not accompany the passage of § 922(o), the subject matter of § 922(o) is sufficiently similar to that of the other legislation accompanied by these findings so as to be a reliable statement of the rationale for Congress' authority to pass § 922(o). Congressional findings generated throughout Congress' history of firearms regulation link both the flow of firearms across state lines and their consequential indiscriminate availability with the resulting violent criminal acts that are beyond the effective control of the states. Thus, § 922(o) does not "plow new ground," as the Lopez majority said § 922(q) did. Id. at ----, 115 S.Ct. at 1632. Rather than represent a "sharp break" in pattern, which concerned the Lopez Court, it continues in the stream of prior legislation.
 
 
 36
 The National Firearms Act of 1934, the first major federal statute to deal with firearms, required all persons engaged in the business of selling "firearms" (including machine guns) and all firearm owners to register with the Collector of Internal Revenue, subjected all firearm sales to a special tax, and required that they be accompanied by written order forms. The statute made it illegal to move a firearm in interstate commerce without payment of the tax, or to possess a firearm transferred in contravention of the tax and form requirements. Pub.L. No. 474, §§ 2-6, 48 Stat. 1236, 1237-38 (superseded by Internal Revenue Code of 1939). Although the 1934 statute was enacted under the taxing power, four years later Congress used the commerce power to regulate firearms with the passage of the Federal Firearms Act of 1938. Pub.L. No. 785, 52 Stat. 1250 (1938) (repealed 1968). All subsequent federal firearms legislation was enacted under the commerce power.
 
 
 37
 In the Federal Firearms Act of 1938, Congress required firearm manufacturers and dealers to obtain federal licenses before engaging in interstate commerce, permitted such licensees to ship firearms interstate only to other licensees and to persons with state-required permits, mandated that licensees keep permanent records of firearm transactions, and prohibited the interstate movement of firearms by or to fugitives or persons indicted or convicted of violent crimes, or if the firearms were stolen or had altered serial numbers. Id. §§ 2-3, 52 Stat. at 1250-52.
 
 
 38
 In 1968, Congress decided additional federal legislation was needed, and enacted the more farreaching Omnibus Crime Control and Safe Streets Act ("Omnibus Act"), based upon its findings of an extensive interstate commerce in firearms and the need for adequate federal control over such traffic. Because Rybar places much emphasis on the absence of congressional findings accompanying the passage of § 922(o), the congressional findings supporting the enactment of the Omnibus Act, one of its statutory predecessors, are significant:
 
 
 39
 [T]here is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and ... the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power;
 
 
 40
 ....
 
 
 41
 ... only through adequate Federal control over interstate and foreign commerce in these weapons ... can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible;
 
 
 42
 ....
 
 
 43
 ... the United States has become the dumping ground of the castoff surplus military weapons of other nations, and ... such weapons, ... imported into the United States in recent years, has contributed greatly to lawlessness and to the Nation's law enforcement problems;
 
 
 44
 ... the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons ... has allowed such weapons and devices to fall into the hands of lawless persons, ... thus creating a problem of national concern....
 
 
 45
 Pub.L. No. 90-351, § 901(a), 82 Stat. 197, 225-26 (1968) (current version at 18 U.S.C. §§ 921-928 (1994)).
 
 
 46
 The 1968 Omnibus Act, which incorporated nearly every provision of the Federal Firearms Act, additionally required federal licenses for all persons in the firearms business, regardless of whether the commerce in which they were engaged was interstate. With respect to all firearms except for shotguns and rifles, the Omnibus Act channelled all interstate traffic through licensees and prohibited licensees from transferring them to persons under 21 or living out-of-state. With respect to heavy firearms, including machine guns, the Act prohibited licensees from selling or delivering them without first receiving affidavits from local law enforcement confirming the intended use as lawful, and forbade unlicensed persons from transporting them in interstate commerce without specific Treasury authorization. And with respect to all firearms, the Act prohibited their importation without Treasury authorization, proscribed their sale where their possession or purchase would contravene local law, and declared them subject to forfeiture when involved in violations of its provisions. Id. §§ 922-924, 82 Stat. at 228-33.
 
 
 47
 Later the same year, federal controls over interstate and foreign commerce in firearms were strengthened by the passage of the Gun Control Act of 1968, which extended restrictions similar to those Congress had already applied to handguns to most transactions involving rifles and shotguns, added broader coverage of transactions in ammunition, tightened restrictions on deliveries and sales of heavy firearms, including machine guns, and prohibited interstate movement of firearms by or to unlawful drug users or adjudicated mental defectives. Pub.L. No. 90-618, § 922, 82 Stat. 1213, 1218-21 (1968) (current version at 18 U.S.C. §§ 921-928 (1994)).
 
 
 48
 As with the earlier Omnibus Act, the legislative findings supporting the Gun Control Act emphasized the connection between the increasing rate of crime, the growing use of firearms, and interstate firearms traffic. The House Report explained:
 
 
 49
 The principal purpose of H.R. 17735, as amended, is to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders.
 
 
 50
 ....
 
 
 51
 The increasing rate of crime and lawlessness and the growing use of firearms in violent crime clearly attest to a need to strengthen Federal regulation of interstate firearms traffic.
 
 
 52
 The subject legislation responds to widespread national concern that existing Federal control over the sale and shipment of firearms [across] State lines is grossly inadequate.
 
 
 53
 Handguns, rifles, and shotguns have been the chosen means to execute three-quarters of a million people in the United States since 1900. The use of firearms in violent crimes continues to increase today. Statistics indicate that 50 lives are destroyed by firearms each day. In the 13 months ending in September 1967 guns were involved in more than 6,500 murders, 10,000 suicides, 2,600 accidental deaths, 43,500 aggravated assaults and 50,000 robberies. No civilized society can ignore the malignancy which this senseless slaughter reflects.
 
 
 54
 H.R.Rep. No. 1577, 90th Cong., 2d Sess. 6-7 (1968), reprinted in 1968 U.S.C.C.A.N. 4410, 4411-13.
 
 
 55
 The Report attaches a letter from the Attorney General which states, inter alia:
 
 
 56
 By recognizing the Federal responsibility to control the indiscriminate flow of firearms and ammunition across State borders, this bill will give States and local communities the capacity and the incentive to enforce effectively their own gun control laws. Once enacted into law, it will insure that strong local or State laws are not subverted by a deadly interstate traffic in firearms and ammunition.
 
 
 57
 Id. at 19, 1968 U.S.C.C.A.N. at 4425.
 
 
 58
 Thus, by the time Congress passed the 1986 Firearms Owners' Protection Act ("FOPA"), Pub.L. No. 99-308, 100 Stat. 449 (current version at 18 U.S.C. § 921-928 (1994))--of which § 922(o) is a part--it had already passed three firearm statutes under its commerce power based on its explicit connection of the interstate flow of firearms to the increasing serious violent crime in this country, which Congress saw as creating a problem of "national concern."
 
 
 59
 It is therefore not surprising that when Congress again turned its attention to firearms in 1986, it focused, inter alia, on the hazards of machine guns and the desirability of their control. See H.R.Rep. No. 495, 99th Cong., 2d Sess., 2, 7 (1986), reprinted in 1986 U.S.C.C.A.N. 1327, 1328, 1333 (describing proposed machine gun restrictions as "benefits for law enforcement" and citing "the need for more effective protection of law enforcement officers from the proliferation of machine guns"); id. at 4, 1986 U.S.C.C.A.N. at 1330 (describing machine guns as "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime"); see also 132 Cong. Rec. 9,602 (1986) (statement of Sen. Kennedy) ("The only thing that has changed about the machine gun situation since the 1968 act ... is that machine guns have become a far more serious law enforcement problem.").
 
 
 60
 The fact that the findings accompanying prior firearms legislation were not reiterated with the passage of § 922(o) is not controlling, as evidenced by a long line of Supreme Court cases. See Fullilove v. Klutznick, 448 U.S. 448, 502-03, 100 S.Ct. 2758, 2787, 65 L.Ed.2d 902 (1980) (Powell, J., concurring) (describing "information and expertise that Congress acquires in the consideration and enactment of earlier legislation" as sufficient where "Congress has legislated repeatedly in an area of national concern"); Maryland v. Wirtz, 392 U.S. 183, 190 n. 13, 88 S.Ct. 2017, 2020 n. 13, 20 L.Ed.2d 1020 (1968) (confirming, where Congress had earlier passed related legislation with relevant findings, that subsequent provisions "were presumably based on similar findings and purposes with respect to the areas newly covered"); see also Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 19, 110 S.Ct. 914, 925-26, 108 L.Ed.2d 1 (1990) (suggesting a "history of congressional attempts" in a particular area as basis for heightened deference to legislative judgment); cf. Turner Broadcasting Sys., Inc. v. Federal Communications Comm'n, 512 U.S. 622, ----, 114 S.Ct. 2445, 2471, 129 L.Ed.2d 497 (1994) (Congress not obligated "to make a record of the type that an administrative agency or court does"); Perez v. United States, 402 U.S. 146, 156, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971) (Congress need not "make particularized findings in order to legislate"); Katzenbach v. McClung, 379 U.S. 294, 299, 85 S.Ct. 377, 381, 13 L.Ed.2d 290 (1964) (no formal findings necessary).
 
 
 61
 Unlike the Lopez opinion which may be read to cabin Congress' commerce power to enact § 922(q) regulating guns in a local school zone, the dissent does not challenge Congress' power to enact § 922(o). Instead, the dissent would require as a condition of upholding § 922(o) either that Congress make findings that there was a link between the subject matter being regulated--here the transfer or possession of a machine gun--and its effect on interstate commerce or that "Congress or the Executive assemble[ ] empirical evidence documenting such a link." Dissent at 287; see also id. at 292-93.
 
 
 62
 We know of no authority to support such a demand on Congress. While the dissent writes in the name of "constitutional federalism," it recognizes that even Lopez abjures such a requirement, 514 U.S. at ----, 115 S.Ct. at 1631, referred to in Dissent at 293, but overlooks that making such a demand of Congress or the Executive runs counter to the deference that the judiciary owes to its two coordinate branches of government, a basic tenet of the constitutional separation of powers. Nothing in Lopez requires either Congress or the Executive to play Show and Tell with the federal courts at the peril of invalidation of a Congressional statute.
 
 
 63
 As the Supreme Court has recognized, Congress enacted the federal gun laws because "it was concerned with the widespread traffic in firearms." Huddleston v. United States, 415 U.S. 814, 824, 94 S.Ct. 1262, 1268, 39 L.Ed.2d 782 (1974). It intended "to halt" unregulated "mail-order and interstate consumer traffic in these weapons," id., and "to insure that ... weapons could not be obtained by individuals whose possession of them would be contrary to the public interest," id. at 825, 94 S.Ct. at 1269. Having attempted regulation through registration and licensing and incrementally extended the coverage of earlier statutes, and having in 1968 decided to ban possession of firearms by felons because it "constitutes ... a burden on commerce or threat affecting the free flow of commerce," see United States v. Bass, 404 U.S. 336, 345-46 n. 14, 92 S.Ct. 515, 521 n. 14, 30 L.Ed.2d 488 (1971) (quoting Omnibus Act of 1968, § 1201, 82 Stat. at 236), it was a natural progression for Congress to decide in 1986 that the growth in crime and destruction caused by machine guns had expanded to the point that justified banning the possession and transfer of post-1986 machine guns. There was no reason for Congress to believe that traffic in machine guns had any less connection with interstate commerce than did the possession of a firearm by a felon, and Congress' intent to regulate possession and transfer of machine guns as a means of stemming interstate gun trafficking is manifest.
 
 
 64
 In suggesting that this case is like Lopez, where the Court found that possession of a gun in a local school zone had an insubstantial effect on interstate commerce, the dissent disregards a significant distinction. The statute at issue in Lopez attempted to regulate possession of guns only inside school zones--a discrete area unlikely to have a meaningful aggregate effect on commerce. By contrast, the regulation effected by § 922(o) is not limited to possession "on one's own property," Dissent at 291; it regulates possession of a class of firearms--machine guns--in a much more dispersed and extensive area. Congress could reasonably have concluded that such a general ban of possession of machine guns will have a meaningful effect on interstate commerce that would be more substantial than the effect of banning possession within school zones.
 
 
 65
 Moreover, the concerns expressed by the majority in Lopez, particularly by the concurring opinion of Justice Kennedy, about federal intrusion into local schools, an area traditionally left for the overview and regulation by states, are not presented by § 922(o). Unlike the conclusion in Lopez that "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce," 514 U.S. at ----, 115 S.Ct. at 1634, it is evident from § 922(o) that "possession and transfer" of a machine gun is an economic activity that Congress could reasonably have believed would be repeated elsewhere and thereby substantially affect interstate commerce. The potentiality for repetition by Rybar himself of transactions such as those that were the subject of this indictment is evidenced by the uncontested facts set forth in the Presentence Investigation Report. Rybar was a licensed federal firearms dealer, had been authorized to manufacture firearms, including machine guns, and operated a steel and firearms business from his home. After the confiscation of the two machine guns, federal agents determined that Rybar had 16 National Firearms Act weapons registered to him.[4]
 
 
 66
 The dissent presses us to find a commercial or economic component of possession of a firearm. The response can be found in the dissenting opinion itself. Certainly Congress did not enact § 922(o) in response to the hypothetical situation posed by the dissent by which the possessors of machine guns converted them from semiautomatic weapons or retained them from days of government service. Instead, as the dissent acknowledges, we may infer, at least in most situations, that such possession follows an unlawful transfer. See Dissent at 290-91. We may also assume that Congress was not concerned about the noncommercial transfer from father to son or sister to sister, and thus the unlawful transfer will undoubtedly have had a commercial or economic component. It follows that in 1986 when Congress prohibited possession and transfer of a machine gun, it could well have contemplated that the economic activity regulated, at least in the aggregate, substantially affects interstate commerce.
 
 
 67
 Although Rybar would have us view machine gun possession as a purely intrastate phenomenon, Supreme Court cases have long sustained the authority of Congress to regulate singular instances of intrastate activity when the cumulative effect of a collection of such events might ultimately have substantial effect on interstate commerce. See, e.g., Hodel v. Virginia Surface Mining & Recl. Assn., Inc., 452 U.S. 264, 277, 101 S.Ct. 2352, 2360-61, 69 L.Ed.2d 1 (1981); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 85 S.Ct. 348, 357-58, 13 L.Ed.2d 258 (1964); Wickard v. Filburn, 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942); United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942); see also Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 232, 68 S.Ct. 996, 1004, 92 L.Ed. 1328 (1948).
 
 
 68
 Just as the Court in Wickard sustained the regulation of wheat intended wholly for home consumption because it was connected to an overall interstate market which it could depress, 317 U.S. at 128-29, 63 S.Ct. at 98-91, and the Court in Perez sustained the regulation of purely intrastate loansharking because in the aggregate such local loansharking substantially affected interstate commerce, 402 U.S. at 154, 91 S.Ct. at 1361-62, so also § 922(o) can be sustained because it targets the possession of machine guns as a demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns. It follows, and we hold, that the authority of Congress to enact § 922(o) under the Commerce Clause can be sustained under the third category identified by the Supreme Court: as a regulation of an activity that "substantially affects" commerce.
 
 
 69
 The same approach was followed by the Seventh Circuit which, in sustaining § 922(o) over a Commerce Clause challenge, stated that the statute was "best analyzed" under the third category. United States v. Kenney, 91 F.3d 884, 889 (7th Cir.1996). The court reasoned that § 922(o) was "recognizable as 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated,' " id. at 890 (quoting Lopez, 514 U.S. at ----, 115 S.Ct. at 1631), and therefore more comparable to the wheat-growing scheme in Wickard or the anti-loansharking law in Perez than the Gun-Free School Zones Act in Lopez.
 
 
 70
 Kenney held that "there is a rational basis to regulate the local conduct of machine gun possession, including possession resulting from home manufacture, to effectuate § 922(o)'s purpose of freezing the number of legally possessed machine guns at 1986 levels, an effect that is closely entwined with regulating interstate commerce." Id. The court also determined that, in view of prior congressional findings and enactments concerning firearms and "the serious problems associated with interstate trafficking in firearms," § 922(o) "was not novel but incremental," id., and thus justified "deference to Congress's accumulated institutional expertise," id. at 891.
 
 
 71
 Although we need not address whether § 922(o) is also sustainable under the other two categories of Congress' commerce powers cited by Chief Justice Rehnquist in Lopez, we note that other courts of appeals have relied on those categories in rejecting challenges to § 922(o). Their underlying reasoning provides additional support to our holding that § 922(o) regulates an activity that substantially affects interstate commerce.
 
 
 72
 In sustaining § 922(o), the Courts of Appeals for the Fifth, Sixth and Ninth Circuits viewed § 922(o) as a regulation of "the use of the channels of interstate commerce," the first of the three categories of activity reachable under the commerce power, Lopez, 514 U.S. at ----, 115 S.Ct. at 1629. See United States v. Beuckelaere, 91 F.3d 781 (6th Cir.1996); United States v. Rambo, 74 F.3d 948 (9th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); United States v. Kirk, 70 F.3d 791 (5th Cir.1995), reh'g en banc granted, 78 F.3d 160 (5th Cir.1996). The court in Kirk noted that the statute applied only to machine guns not lawfully possessed before May 1986, and thus functioned principally to prohibit "the introduction into the stream of commerce [of] machineguns" illegally obtained after that date. 70 F.3d at 796. It characterized § 922(o) as a "necessary and proper measure" to permit readier interdiction of, and depress demand for, prohibited machine gun transfers, and likened it to federal regulation of controlled substances as "essential to effective control of the interstate incidents" of traffic in particular commodities. Id. at 796-97.
 
 
 73
 The Ninth Circuit in Rambo observed that, "[b]y regulating the market in machineguns," § 922(o) "effectively regulate[s] the interstate trafficking in machineguns." 74 F.3d at 952. Echoing the Fifth Circuit's analysis in Kirk, the Rambo court reasoned that, because there could be no unlawful possession without first an unlawful transfer, § 922(o)'s regulation of possession "regulates commerce" itself. Id. at 951-52. Unlike § 922(q), which regulated possession of weapons "in a specific geographic area" rather than any market in weapons, § 922(o) "prohibits the possession of all machineguns illegally transferred." Id. at 952.
 
 
 74
 Similarly, the Sixth Circuit in Beuckelaere characterized the statute as regulating the "extensive, intricate, and definitely national market for machineguns" acquired after May 19, 1986, 91 F.3d at 784 (quoting United States v. Hunter, 843 F.Supp. 235, 249 (E.D.Mich.1994)), and emphasized the statute's links to interstate commerce. It observed that "illegal possession of a machinegun cannot occur without an illegal transfer," and stressed Congress' prior findings concerning the interstate flow of firearms and the resulting threats to local law enforcement. 91 F.3d at 784-85.
 
 
 75
 The Beuckelaere court also held § 922(o) sustainable under the second category of Congress' commerce power, reasoning that machine guns are "things in interstate commerce." The court observed that, like narcotics, machine guns are items "which flow across state lines for profit by business entities and hamper local and state law enforcement efforts." Id. at 785.
 
 
 76
 That court relied on the Tenth Circuit's earlier decision in United States v. Wilks, 58 F.3d 1518 (10th Cir.1995), which had upheld § 922(o) under the second commerce category. The Wilks court characterized machine guns as commodities "bound up with interstate attributes" and thus readily distinguished from the "purely intrastate" objects of § 922(q)'s prohibition. Id. at 1521. The court observed that § 922(o) was "consistent" with earlier firearms legislation "because it merely regulates the movement of a particular firearm in interstate commerce," id. at 1521 n. 4, surveyed prior congressional findings concerning the interstate flow of weapons and its attendant dangers, and concluded that § 922(o) represented a valid attempt to control the interstate movement in machine guns, id. at 1521-22.
 
 
 77
 Whatever the category relied on, it is telling that each of our sister circuits has found that the regulation of machine gun transfer and possession comes within Congress' power to legislate under the Commerce Clause. That uniform result confirms the observation made in United States v. Bell, 70 F.3d 495, 497 (7th Cir.1995), that, for criminal defendants, "[i]t appears that United States v. Lopez has raised many false hopes," and that challenges based on Lopez "[a]lmost invariably" fail. See, e.g., United States v. Orozco, 98 F.3d 105 (3d Cir.1996) (rejecting challenge based on Lopez to Drug-Free School Zones Act, 21 U.S.C. § 860(a)); United States v. Bishop, 66 F.3d 569 (3d Cir.1995) (rejecting challenge to car-jacking statute).
 
 
 78
 Finally, we deal with Rybar's argument that § 922(o) is deficient because it lacks a "jurisdictional element," the term used to refer to a statutory clause (such as "in or affecting interstate commerce") that limits application of the statute to those instances where the particular machine gun transfer or possession is shown to be related to interstate commerce. Although the Lopez Court noted the lack of a jurisdictional element in § 922(q) and observed that such an element "would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce," 514 U.S. at ----, 115 S.Ct. at 1631 (emphasis added), it did not state, as it easily could have, that such a statutory feature was essential.
 
 
 79
 In its discussion of this issue, the Court contrasted § 922(q) with former 18 U.S.C.App. § 1202(a) (prohibiting felons from "receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce ... any firearm"). In United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), the Court had construed the ambiguous scope of the jurisdictional element in former § 1202(a) to apply to possession of firearms in order to avoid a constitutional issue. However, rather than making it a sine qua non, the Bass decision merely signified that a statute's inclusion of a jurisdictional element is a condition sufficient to establish its validity under the Commerce Clause. We find no basis in either Bass or Lopez for Rybar's claim that inclusion of such language is a necessary condition. See Kenney, 91 F.3d at 887 ("We have rejected the argument that Lopez requires federal criminal statutes to contain a jurisdictional element.").[5]
 
 
 80
 We thus join the five other circuits in rejecting the Commerce Clause challenge to Congress' authority to enact § 922(o).
 
 B.
 Second Amendment
 
 81
 As an independent basis for his argument that § 922(o) is unconstitutional, Rybar relies on the Second Amendment of the Constitution, which provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.
 
 
 82
 In support, Rybar cites, paradoxically, the Supreme Court decision in United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), where the Court upheld the constitutionality of a firearms-registration requirement against a Second Amendment challenge. Rybar draws on that holding, relying on the Miller Court's observation that the sawed-off shotgun in question had not been shown to bear "some reasonable relationship to the preservation or efficiency of a well regulated militia." Brief of Appellant at 24-25; Miller, 307 U.S. at 178, 59 S.Ct. at 818. Drawing from that language the contrapositive implication, Rybar suggests that because the military utility of the machine guns proscribed by § 922(o) is clear, a result contrary to that reached in Miller is required, and the statute is therefore invalid under the Second Amendment.
 
 
 83
 Rybar's reliance on Miller is misplaced. The language Rybar cites is taken from the following passage:
 
 
 84
 In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.
 
 
 85
 307 U.S. at 178, 59 S.Ct. at 818.
 
 
 86
 We note first that however clear the Court's suggestion that the firearm before it lacked the necessary military character, it did not state that such character alone would be sufficient to secure Second Amendment protection. In fact, the Miller Court assigned no special importance to the character of the weapon itself, but instead demanded a reasonable relationship between its "possession or use" and militia-related activity. Id.; see Cases v. United States, 131 F.2d 916, 922 (1st Cir.1942) (susceptibility of firearm to military application not determinative), cert. denied, 319 U.S. 770, 63 S.Ct. 1431, 87 L.Ed. 1718 (1943). Rybar has not demonstrated that his possession of the machine guns had any connection with militia-related activity. Indeed, as noted above, Rybar was a firearms dealer and the transactions in question appear to have been consistent with that business activity.
 
 
 87
 Nonetheless, Rybar attempts to place himself within the penumbra of membership in the "militia" specified by the Second Amendment by quoting from 10 U.S.C. § 311(a):
 
 
 88
 The militia of the United States consists of all able-bodied males at least 17 years of age and, except as provided in section 313 of title 32, under 45 years of age who are ... citizens of the United States....
 
 
 89
 Rybar's invocation of this statute does nothing to establish that his firearm possession bears a reasonable relationship to "the preservation or efficiency of a well regulated militia," as required in Miller, 307 U.S. at 178, 59 S.Ct. at 818. Nor can claimed membership in a hypothetical or "sedentary" militia suffice. See United States v. Hale, 978 F.2d 1016, 1020 (8th Cir.1992), cert. denied, 507 U.S. 997, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993); United States v. Oakes, 564 F.2d 384, 387 (10th Cir.1977), cert. denied, 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978); United States v. Warin, 530 F.2d 103, 106 (6th Cir.), cert. denied, 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976).
 
 
 90
 Rybar boldly asserts that "the Miller Court was quite simply wrong in its superficial (and one-sided) analysis of the Second Amendment." Brief of Appellant at 27. As one of the inferior federal courts subject to the Supreme Court's precedents, we have neither the license nor the inclination to engage in such freewheeling presumptuousness. In any event, this court has on several occasions emphasized that the Second Amendment furnishes no absolute right to firearms. See United States v. Graves, 554 F.2d 65, 66 n. 2 (3d Cir.1977); Eckert v. City of Philadelphia, 477 F.2d 610 (3d Cir.), cert. denied, 414 U.S. 839, 843, 94 S.Ct. 89, 104, 38 L.Ed.2d 74, 81 (1973). Federal attempts at firearms regulation have also consistently withstood challenge under the Second Amendment. See, e.g., Hale, 978 F.2d at 1020; Warin, 530 F.2d at 108; United States v. Three Winchester 30-30 Caliber Lever Action Carbines, 504 F.2d 1288, 1290 n. 5 (7th Cir.1974); United States v. Johnson, 497 F.2d 548, 550 (4th Cir.1974); Cases, 131 F.2d at 923. We see no reason why § 922(o) should be an exception.
 
 III.
 CONCLUSION
 
 91
 In light of the foregoing, we reject Rybar's challenge to the constitutional validity of 18 U.S.C. § 922(o) and will affirm the district court's judgment of conviction.
 
 ALITO, Circuit Judge, dissenting:
 
 92
 Was United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), a constitutional freak? Or did it signify that the Commerce Clause still imposes some meaningful limits on congressional power?
 
 
 93
 The statutory provision challenged in this case, the portion of 18 U.S.C. § 922(o) that generally prohibits the purely intrastate possession[1] of a machine gun, is the closest extant relative of the statute struck down in Lopez, 18 U.S.C. § 922(q)(1)(A), which made it a federal offense knowingly to possess a firearm in a school zone. Both are criminal statutes that regulate the purely intrastate possession of firearms. Both statutes, departing from the mold of prior federal criminal statutes governing firearms possession, lack a jurisdictional element,[2] that is, they do not require federal prosecutors to prove that the firearms were possessed in or affecting interstate commerce. Compare, e.g., 18 U.S.C. § 922(d). And in passing both statutes, Congress made no findings regarding the link between the intrastate activity regulated by these laws and interstate commerce. If Lopez does not govern this case, then it may well be a precedent that is strictly limited to its own peculiar circumstances. That may be what the majority here would like, see Maj. Op. at 283 (citation omitted) ("challenges based on Lopez '[a]lmost invariably' fail"), but our responsibility is to apply Supreme Court precedent. That responsibility, it seems to me, requires us to invalidate the statutory provision at issue here in its present form.
 
 
 94
 This would not preclude adequate regulation of the private possession of machine guns. Needless to say, the Commerce Clause does not prevent the states from regulating machine gun possession, as all of the jurisdictions within our circuit have done. See Del.Code Ann. tit. 11, § 1444 (1995); N.J.Stat.Ann. § 2C:39-5a (West 1995); 18 Pa.Cons.Stat.Ann. § 908 (1996); V.I.Code Ann. tit. 14, § 2253 (1994). Moreover, the statute challenged here would satisfy the demands of the Commerce Clause if Congress simply added a jurisdictional element--a common feature of federal laws in this field and one that has not posed any noticeable problems for federal law enforcement. In addition, as I explain below, 18 U.S.C. § 922(o) might be sustainable in its current form if Congress made findings that the purely intrastate possession of machine guns has a substantial effect on interstate commerce or if Congress or the Executive assembled empirical evidence documenting such a link. If, as the government and the majority baldly insist, the purely intrastate possession of machine guns has such an effect, these steps are not too much to demand to protect our system of constitutional federalism.
 
 I.
 
 95
 In Lopez, the Supreme Court identified "three broad categories" of legislation permitted under the Commerce Clause: (1) regulation of "the use of the channels of interstate commerce," (2) regulation and protection of "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) regulation of "activities that substantially affect interstate commerce."[3]
 
 
 96
 514 U.S. at ---- - ----, 115 S.Ct. at 1629-30.
 
 
 97
 The majority in this case quite properly focuses its analysis primarily on the third of these categories--Congress's power to regulate those "activities that substantially affect interstate commerce"--because this is plainly the category under which 18 U.S.C. § 922(o) must be analyzed. But panels in the Fifth, Sixth, Ninth, and Tenth Circuits have tried to shoehorn 18 U.S.C § 922(o) into the first or second categories, and the majority cannot bring itself to acknowledge these courts' errors. Therefore, without embracing or repudiating the reasoning of these other courts, the majority writes:
 
 
 98
 Whatever the category relied on, it is telling that each of our sister circuits has found that the regulation of machine gun transfer and possession comes within Congress' power to legislate under the Commerce Clause. That uniform result confirms the observation made in United States v. Bell, 70 F.3d 495, 497 (7th Cir.1995), that, for criminal defendants, "[i]t appears that United States v. Lopez has raised many false hopes," and that challenges based on Lopez "[a]lmost invariably" fail.
 
 
 99
 Maj. Op. at 283. This approach requires me to discuss the first two categories and explain why I believe they are clearly inapplicable here.
 
 II.
 
 100
 Regulation of the channels of commerce. As the majority notes (Maj. Op. at 283), panels in the Fifth, Sixth, and Ninth Circuits have upheld 18 U.S.C. § 922(o) as a regulation of "the use of the channels of interstate commerce." Lopez, 514 U.S. at ----, 115 S.Ct. at 1629. See United States v. Beuckelaere, 91 F.3d 781, 783 (6th Cir.1996); United States v. Rambo, 74 F.3d 948, 951-52 (9th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); United States v. Kirk, 70 F.3d 791, 796 (5th Cir.1995), reh'g en banc granted, 78 F.3d 160 (5th Cir.1996). However, these courts seem to me to have fundamentally misunderstood the first category set out in Lopez.
 
 
 101
 To illustrate the meaning of this category, Lopez quoted a sentence from Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), in which the Court upheld the constitutionality of the so-called White Slave Traffic Act, which prohibited the interstate transportation of women for prostitution or other immoral purposes. The sentence from Caminetti that was partially quoted in Lopez was as follows:
 
 
 102
 The transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress, under the commerce clause of the Constitution, and the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.
 
 
 103
 Lopez, 514 U.S. at ----, 115 S.Ct. at 1629, citing Caminetti, 242 U.S. at 491, 37 S.Ct. at 196-97. Lopez also cited United States v. Darby, 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941), where the Court wrote:
 
 
 104
 Congress, following its own conception of public policy concerning the restrictions which may appropriately be imposed on interstate commerce, is free to exclude from the commerce articles whose use in the states for which they are destined it may conceive to be injurious to the public health, morals, or welfare, even though the state has not sought to regulate their use.
 
 
 105
 In support of this statement, the Darby Court cited (id.), among other cases, Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903) (the "Lottery Case"), which upheld a law prohibiting the interstate shipment of lottery tickets, and Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364 (1911), which sustained a law banning the interstate shipment of adulterated food. Thus, it seems clear that the first category of Commerce Clause authority outlined in Lopez concerns Congress's power to regulate, for economic or social purposes, the passage in interstate commerce of either people or goods.
 
 
 106
 The statute at issue in this case, 18 U.S.C. § 922(o), would fall within this category if it barred the interstate shipment of machine guns, but of course that is not what it does. Instead, it goes much farther and reaches the wholly intrastate possession of machine guns. I therefore agree with the Seventh Circuit, which, while sustaining 18 U.S.C. § 922(o) under the third Lopez category, candidly acknowledged that it did not fall within the first. United States v. Kenney, 91 F.3d 884, 889 (7th Cir.1996); see also Beuckelaere, 91 F.3d at 787-88 (Suhrheinrich, J., dissenting); Kirk, 70 F.3d at 799 (Jones, J., dissenting).
 
 
 107
 In holding that 18 U.S.C. § 922(o) falls within the first category, the Fifth, Sixth, and Ninth Circuits reasoned chiefly as follows. This statute, while generally banning the private possession of machine guns, does not apply to machine guns lawfully possessed prior to its enactment in 1986. See 18 U.S.C. § 922(o)(2)(B). Therefore, "there could be no unlawful possession under section 922(o) without an unlawful transfer." Kirk, 70 F.3d at 796. Accordingly, "the limited ban on possession of machineguns must be seen as a necessary and proper measure meant to allow law enforcement to detect illegal transfers where the banned commodity has come to rest: in the receiver's possession. In effect, the ban on such possession is an attempt to control the interstate market for machineguns by creating criminal liability for those who would constitute the demand-side of the market, i.e., those who would facilitate illegal transfer out of desire to acquire mere possession." Id.; see also Beuckelaere, 91 F.3d at 783; Rambo, 74 F.3d at 951-52.
 
 
 108
 There are numerous flaws in this analysis. First (but least important), it is not true that every possession criminalized by 18 U.S.C. § 922(o) must be preceded by an "unlawful transfer." A lawfully possessed semiautomatic weapon could be converted by its owner into an automatic. See Kenney, 91 F.3d at 889. The statute may also reach a person who initially possesses a machine gun lawfully pursuant to 18 U.S.C. § 922(o)(2)(A), which permits possession under governmental authority, but who exceeds the scope of that authority or retains possession after it has terminated. Second and more important, this reasoning seems to confuse an unlawful transfer with an interstate transfer. Even if it were true that every possession made illegal by 18 U.S.C. § 922(o) were preceded by an unlawful transfer, it would not follow that every such possession is preceded by an interstate transfer, and Congress's authority under the first Lopez category concerns the passage of people and goods in the channels of interstate commerce. Third, insofar as the Fifth, Sixth, and Ninth Circuits justified 18 U.S.C § 922(o) as an attempt to suppress an interstate market by banning purely intrastate possession, their arguments fall within the third Lopez category, i.e., Congress's authority to regulate an intrastate activity (intrastate possession) that has a substantial effect on interstate commerce (the interstate market). The Seventh Circuit recognized this point when it wrote:
 
 
 109
 [A]lthough it may be true that Congress must regulate intrastate transfers and even mere possessions of machine guns in aid of its prerogative of preventing the misuse of the channels of interstate commerce, the regulation still regulates much more than the channels of commerce. This rationale is therefore an aspect of Congress's broader power to regulate things "affecting" interstate commerce; we must look further, in light of Lopez, to confirm the existence of a rational and substantial basis underlying its power to do so.
 
 
 110
 Kenney, 91 F.3d at 889.
 
 III.
 
 111
 Regulation of activities that threaten the instrumentalities of interstate commerce or persons or things in interstate commerce. In Lopez, the Court wrote that "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S. at ----, 115 S.Ct at 1629. The Court cited two cases involving the exercise of this power. The first, Houston, E. & W. Tex. Ry. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), (the "Shreveport Rate Cases") in which the Court upheld the regulation of intrastate railroad rates on the theory that this regulation was needed to protect "the security of [interstate] traffic," "the efficiency of the interstate service," and "the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance." Id. at 351, 34 S.Ct. at 836. The second Southern Ry. v. United States, 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911), upheld federal safety regulations as applied to trains and railroad cars travelling intrastate on a railroad line that was a highway of interstate commerce. The Court reasoned that the "absence of appropriate safety appliances" from the intrastate trains and cars was "a menace," not only to those trains and cars, but also to those moving in interstate commerce. Id. at 27, 32 S.Ct. at 4. See United States v. Bishop, 66 F.3d 569, 597-98 (3d Cir.1995)(Becker, J., concurring in part and dissenting in part).
 
 
 112
 In addition to these two cases, the Lopez Court cited two statutes that had been listed in Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359-60, 28 L.Ed.2d 686 (1971), as falling within this category of congressional authority. See Lopez, --- U.S. at ----, 115 S.Ct. at 1629. The statutes were 18 U.S.C § 32, which, at the time of Perez, made it a crime to damage or destroy an aircraft that was used in interstate commerce, and 18 U.S.C. § 659, which criminalizes thefts from interstate shipments.
 
 
 113
 Based on the Lopez Court's description of this second category of congressional authority and on the examples that it provided, it is apparent that this authority reaches threats to "the instrumentalities" of interstate commerce, i.e., the means of conveying people and goods across state lines, such as airplanes and trains. This power also reaches threats to people and goods travelling in interstate commerce, such the theft of goods moving interstate and the setting of rates that could affect interstate trade.
 
 
 114
 Title 18 U.S.C. § 922(o) would fall within this second Lopez category if Congress had banned the intrastate possession of machine guns in order to prevent them from being used to damage vehicles travelling interstate, to carry out robberies of goods moving in interstate commerce, or to threaten or harm interstate travellers. However, there is no indication that Congress passed 18 U.S.C. § 922(o) for any of these reasons; and neither the government, the majority in this case, nor any of the other courts of appeals have adduced any evidence that this statute is needed for any of these purposes. Thus, I agree with the Seventh Circuit that 18 U.S.C § 922(o) "appears to be an ill fit in the second" Lopez category. Kenney, 91 F.3d at 889.
 
 
 115
 Although the Sixth and Tenth Circuits upheld 18 U.S.C. § 922(o) under this second category, I find their reasoning elusive. Both courts stressed that machine guns travel in interstate commerce. See Beuckelaere, 91 F.3d at 784 ("Machineguns travel in interstate commerce, posing a threat to local law enforcement, which has a disruptive effect on interstate commerce."); United States v. Wilks, 58 F.3d 1518, 1521 (10th Cir.1995) ("machineguns ... by their nature are 'a commodity ... transferred across state lines for profit by business entities' ")("[t]he interstate flow of machineguns ... is interstate commerce"). But how these assertions show that 18 U.S.C § 922(o) can be sustained under the second Lopez category, I am at a loss to understand. Those machine guns that are actually travelling in interstate commerce may be regulated under the first Lopez category, i.e., Congress may ban them from the channels of interstate commerce altogether or restrict their admission. However, machine guns that are simply possessed intrastate and are not travelling in interstate commerce may not be regulated under the first Lopez category, and as previously explained, unless they are menacing interstate commerce, they do not fall within the second category either.
 
 
 116
 Accordingly, I think it is clear that "if [18 U.S.C. § 922(o) ] is to be sustained," it cannot be under the first or second Lopez categories, but "must be under the third category as a regulation of an activity that substantially affects interstate commerce." Lopez, 514 U.S. at ----, 115 S.Ct. at 1630.IV.
 
 
 117
 Regulation of activities that substantially affect interstate commerce. I come now to the crux of this case, viz., whether 18 U.S.C. § 922(o) can be upheld in its present form and on the present record on the ground that the purely intrastate possession of machine guns substantially affects interstate commerce. As I understand its opinion, the majority advances two separate theories, and I will address each separately.
 
 A. The majority writes:
 
 118
 Just as the Court in Wickard [v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122, 125 (1942),] sustained the regulation of wheat intended wholly for home consumption because it was connected to an overall interstate market which it could depress, 317 U.S. at 128-29 [63 S.Ct. at 90-91], and the Court in Perez [v. United States, 402 U.S. 146, 156, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971),] sustained the regulation of purely intrastate loansharking because in the aggregate such local loansharking substantially affected interstate commerce, 402 U.S. at 155-57 [91 S.Ct. at 1362-63], so also § 922(o) can be sustained because it targets the possession of machine guns as a demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns.
 
 
 119
 Maj. Op. at 281-82. In other words, the majority argues in effect that the private, purely intrastate possession of machine guns has a substantial effect on the interstate machine gun market.
 
 
 120
 This theory, if accepted, would go far toward converting Congress's authority to regulate interstate commerce into "a plenary police power." Lopez, 514 U.S. at ----, 115 S.Ct. at 1633. If there is any sort of interstate market for a commodity--and I think that it is safe to assume that there is some sort of interstate market for practically everything--then the purely intrastate possession of that item will have an effect on that market, and outlawing private possession of the item will presumably have a substantial effect. Consequently, the majority's theory leads to the conclusion that Congress may ban the purely intrastate possession of just about anything. But if Lopez means anything, it is that Congress's power under the Commerce Clause must have some limits. Cf. Charles Fried, Foreword: Revolutions?, 109 HARV.L.REV. 13, 36-37 (1995).
 
 
 121
 The Lopez Court of course recognized the potential sweep of Wickard, on which the majority's theory is chiefly based, and the Lopez Court sought to place reasonable limits on that theory. Observing that Wickard represents "perhaps the most far reaching example of Commerce Clause authority over interstate activity," the Court noted that Wickard "involved economic activity in a way that the possession of a gun in a school zone does not." 514 U.S. at ----, 115 S.Ct. at 1630. The Court then added:
 
 
 122
 Section 922(q) is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.
 
 
 123
 514 U.S. at ---- - ----, 115 S.Ct. at 1630-31 (footnote omitted).
 
 
 124
 The activity that the Lopez Court found was not "economic" or "connected with a commercial transaction" was a type of intrastate firearm possession, i.e., the possession of a firearm (including a machine gun) within a school zone. At issue here is another type of purely intrastate firearm possession, i.e., the purely intrastate possession of a machine gun. If the former must be regarded as non-economic and non-commercial, why isn't the same true of the latter? Is possession of a machine gun inherently more "economic" or more "commercial" than possession of other firearms?[4] Is the possession of a firearm within a school zone somehow less "economic" and "commercial" than possession elsewhere--say, on one's own property?[5] If there are distinctions of constitutional dimension here, they are too subtle for me to grasp. It seems to me that the most natural reading of Lopez is that the simple possession of a firearm, without more, is not "economic" or "commercial" activity in the same sense as the production of wheat in Wickard and that therefore such possession cannot be regulated under the Wickard theory. Cf. United States v. Bishop, 66 F.3d at 601-02 (Becker, J., concurring in part and dissenting in part).
 
 
 125
 B. The majority's second theory appears to be that Congress could have rationally concluded that the purely intrastate possession of machine guns increases the incidence of certain crimes--the majority specifically mentions violent crime, racketeering, and drug trafficking--that are of "national concern." See Maj. Op. at 280-81. In order to bring this case within the third Lopez category, it is not enough to observe that violent criminals, racketeers, and drug traffickers occasionally use machine guns in committing their crimes and that these crimes have interstate effects. Rather, there must be a reasonable basis for concluding that the regulated activity (the purely intrastate possession of machine guns) facilitates the commission of these crimes to such a degree as to have a substantial effect on interstate commerce.
 
 
 126
 I take this theory very seriously, but my problem with it is that it rests on an empirical proposition for which neither Congress, the Executive (in the form of the government lawyers who briefed and argued this case), nor the majority has adduced any appreciable empirical proof.
 
 
 127
 I would view this case differently if Congress as a whole or even one of the responsible congressional committees had made a finding that intrastate machine gun possession, by facilitating the commission of certain crimes, has a substantial effect on interstate commerce. But despite the resources at their command to investigate questions such as this, neither Congress nor any of its committees did so, and indeed Congress never even identified the source of constitutional authority under which 18 U.S.C. § 922(o) was enacted. Of course, Congress is not obligated to make findings. "But to the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here." Lopez, 514 U.S. at ----, 115 S.Ct. at 1632.
 
 
 128
 Likewise, the Justice Department, which has been litigating the constitutionality of 18 U.S.C. § 922(o) in courts across the country, has not brought to our attention any studies or reports by federal law enforcement agencies or others that establish that the purely intrastate possession of machine guns has a substantial effect on interstate commerce.
 
 
 129
 Without assistance from Congress or the Executive, the majority has combed the legislative history of federal firearms legislation going back more than a half century, but in my view the majority has not found anything of significant value for present purposes. The majority cites congressional findings made in connection with prior firearms legislation concerning the problems resulting from the interstate movement of firearms. See Maj. Op. at 279 (emphasis added) (findings that "link both the flow of firearms across state lines and their consequential indiscriminate availability with the resulting violent criminal acts that are beyond the effective control of the states"); Maj. Op. at 279 (emphasis added) ("findings of an extensive interstate commerce in firearms and the need for adequate federal control over such traffic"); Maj. Op. at 280 (emphasis added)(findings emphasizing "the connection between the increasing rate of crime, the growing use of firearms, and interstate firearms traffic )"; Maj. Op. at 281 (connection between "the interstate flow of firearms [and] the increasing serious crime in this country"). However, the question here is not whether the interstate flow of firearms substantially affects interstate commerce; rather, the question is whether the entirely intrastate possession of machine guns has such an effect, and none of the findings noted above speak to that question. Indeed, Congress had no occasion to consider that question when it made those findings, since none of the laws in connection with which those findings were made reached purely intrastate possession without requiring proof in court of a jurisdictional link.
 
 
 130
 The remaining underpinnings of the majority's analysis are three snippets from a committee report and one comment made on the floor of the Senate. The committee report, H.R.Rep. No. 495, 99th Cong., 2d Sess. (1986), reprinted in 1986 U.S.C.C.A.N. 1327, concerned a bill, H.R. 4332, 99th Cong., 2d Sess. (1986), that lacked any provision similar to 18 U.S.C. § 922(o). Instead, H.R. 4332 dealt with machine guns by providing (sec. 11) for enhanced penalties for defendants who used or carried a machine gun during and in relation to a federal drug trafficking offense or a federal crime of violence. See 18 U.S.C. § 924(c). This provision did not raise any new Commerce Clause problems, because the statutes creating the underlying federal drug trafficking offenses or crimes of violence had presumably been enacted pursuant to one of the federal government's delegated powers (whether the Commerce Clause or some other provision). Accordingly, the committee had no need to consider the general question of the relationship between machine guns and interstate commerce, much less the specific question of the relationship between intrastate machine gun possession and interstate commerce, and there is no indication that the committee explored either of these topics.
 
 
 131
 Not surprisingly, however, since H.R. 4332 provided for enhanced penalties in certain cases involving machine gun use, the committee did mention machine guns, and it is upon these fleeting references that the majority relies. The first reference, which appears in a portion of the report captioned "BENEFITS FOR LAW ENFORCEMENT" simply summarizes the enhanced penalty provision. H.R. Rep. 495, supra, at 2, 1986 U.S.C.C.A.N. at 1328. This statement obviously has nothing to do with interstate commerce.
 
 
 132
 The next reference concerns another bill, H.R. 3155, 99th Cong., 1st Sess. (1985), entitled the "Racketeer Weapons and Violent Crime Control Act of 1985," that contained a provision (sec. 3(b)) very much like 18 U.S.C. § 922(o). The report states that this bill would have "prohibited the transfer and possession of machine guns used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime." H.R. Rep. 495, supra at 4, 1986 U.S.C.C.A.N. 1330. I do not think that it is reasonable to conclude based on this brief statement that the committee looked into the question and found that there was a substantial link between the conduct prohibited by that bill (the intrastate possession of machine guns) and interstate commerce. After all, the committee did not recommend adoption of the prohibition on intrastate possession contained in H.R. 3155.
 
 
 133
 The final reference in the committee report concerns "the need for more effective protection of law enforcement officers from the proliferation of machine guns and high-powered 'assault-type' weapons that are increasingly being used by criminals." H.R. Rep. 495, supra at 7, 1986 U.S.C.C.A.N. at 1333. This statement, which lumps together machine guns and assault weapons, says nothing about interstate commerce or particular types of crimes that have substantial interstate effects; and since the committee did not recommend banning the private, intrastate possession of machine guns, the committee presumably felt that the needs of law enforcement would be met by the more limited machine gun provision that it favored. Viewing all three of the statements in the committee report together, I do not think that it is reasonable to conclude that the committee considered or drew any conclusions concerning the relationship between intrastate machine gun possession and interstate commerce.
 
 
 134
 Nor do I see any value for present purposes in the last bit of congressional material unearthed by the majority, a statement made by Senator Kennedy in a colloquy concerning 18 U.S.C. § 922(o). Voicing opposition to a proposal to "grant amnesty to people who now possess machineguns outside the law," Senator Kennedy stated: "The only thing that has changed about the machine gun situation since the 1968 act, and the limited amnesty granted then, is that machine guns have become a far more serious law enforcement problem." 132 Cong. Rec. 9,602 (1986). This observation by a single member of Congress says nothing about interstate commerce or crimes having substantial interstate effects.
 
 
 135
 In sum, we are left with no congressional findings and no appreciable empirical support for the proposition that the purely intrastate possession of machine guns, by facilitating the commission of certain crimes, has a substantial effect on interstate commerce, and without such support I do not see how the statutory provision at issue here can be sustained--unless, contrary to the lesson that I take from Lopez, the "substantial effects" test is to be drained of all practical significance.[6] As Lopez reminded us, the "constitutionally mandated division of authority [between the federal government and the states] 'was adopted by the Framers to ensure protection of our fundamental liberties.' " Lopez, 514 U.S. at ----, 115 S.Ct. at 1626, quoting Gregory v. Ashcroft, 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991). See also Lopez, 514 U.S. at ---- - ----, 115 S.Ct. at 1638-39 (Kennedy, J., concurring). And even today, the normative case for federalism remains strong. See Steven G. Calabresi, "A Government of Limited and Enumerated Powers": In Defense of United States v. Lopez, 94 Mich.L.Rev. 752, 756-790 (1995). Out of respect for this vital element, we should require at least some empirical support before we sustain a novel law that effects "a significant change in the sensitive relation between federal and state criminal jurisdiction." United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971).
 
 
 
 *
 Honorable Marjorie O. Rendell, United States District Judge for the Easter District of Pennsylvania, sitting by designation
 
 
 [1]
 On March 5, 1996, the Fifth Circuit granted a rehearing en banc. See United States v. Kirk, 78 F.3d 160 (5th Cir.1996)
 
 
 [2]
 Because the government has not appealed this aspect of the court's ruling, we do not comment on the district court's analysis
 
 
 [3]
 In Virginia Surface Mining, 452 U.S. at 276, 101 S.Ct. at 2360, the Court had framed the question merely as whether the activity regulated "affects interstate commerce," without the adverb "substantially" that was added by the Lopez majority. See also Hodel v. Indiana, 452 U.S. 314, 324, 326, 101 S.Ct. 2376, 2383, 2384, 69 L.Ed.2d 40 (1981)
 
 
 [4]
 Therefore, looking at the totality of the activity with which Rybar was charged, it was more than "the purely intrastate possession of a machine gun," see Dissent at 291, and he was certainly not one who was simply in "private possession of machine guns," see Dissent at 287
 
 
 [5]
 Because Rybar interposed a facial challenge to § 922(o) there was no occasion for the district court to consider whether, in fact, these two machine guns had passed through interstate commerce. We note but do not rely on the fact that although Rybar was authorized to manufacture firearms, including machine guns, the very nature of the machine guns he possessed and sold to Baublitz, one of which was a U.S. military machine gun and the other described as a "Chinese Type 54" machine gun, suggests interstate traffic
 
 
 [1]
 Title 18 U.S.C. § 922(o) also applies to transfers of machine guns. However, the defendant in this case pled guilty to two counts of the indictment charging only possession, and thus the constitutionality of the transfer provision is not before us here
 
 
 [2]
 See United States v. Lopez, 2 F.3d 1342, 1347 (5th Cir.1993), aff'd, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)
 
 
 [3]
 The court wrote:
 [W]e have identified three broad categories of activity that Congress may regulate under its commerce power.... First, Congress may regulate the use of the channels of interstate commerce. See, e.g., [United States v. Darby, 312 U.S. 100, 113-15, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 256, 85 S.Ct. 348, 357, 13 L.Ed.2d 258 (1964) ] ('[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.' ) (quoting Caminetti v. United States, 242 U.S. 470, 491, 37 S.Ct. 192, 197, 61 L.Ed. 442 (1917)). Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. See, e.g., Shreveport Rate Cases, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); Southern R. Co. v. United States, 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911)(upholding amendments to Safety Appliance Act as applied to vehicles used in intrastate commerce); [Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971) ] ("[F]or example, the destruction of an aircraft (18 U.S.C. § 32), or ... thefts from interstate shipments (18 U.S.C. § 659)"). Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, [NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937) ], i.e., those activities that substantially affect interstate commerce. [Maryland v. Wirtz, 392 U.S. 183, 196 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968).]
 
 
 [4]
 See United States v. Bishop, 66 F.3d at 587 n. 27 ("The dangerousness of the object is not the source of Congressional power; the connection to interstate commerce is.")
 
 
 [5]
 The majority does not explain why possession of a firearm within a school zone is less "commercial" or "economic" than possession elsewhere--because it plainly is not. (If someone drives through a school zone with a firearm in his possession, does that person quickly cease to engage in a "commercial" activity on entering the zone and then quickly begin on leaving?) Instead, the majority argues that a general ban on the possession of machine guns may reasonably be viewed as having a greater effect on interstate commerce than a ban on the possession of all firearms within certain limited areas (school zones). See Maj. Op. 282. But this argument says nothing about the "commercial" or "noncommercial" character of firearms possession
 
 
 [6]
 The majority's suggestion (Maj. Op. 281) that my analysis "requires either Congress or the Executive to play Show and Tell with the federal courts" is simply wrong. The Supreme Court has recognized the importance of congressional findings. See, e.g., Lopez, 514 U.S. at ----, 115 S.Ct. at 1632. Indeed, in United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), where the Court construed ambiguous language in a felon-in-possession statute to require proof that the possession was connected with interstate commerce, the Court wrote: "In light of our disposition of the case, we do not reach the question whether, upon appropriate findings, Congress can constitutionally punish the 'mere possession' of firearms." Id. at 339 n. 4, 92 S.Ct. at 517 n. 4
 With respect to the Executive, it is a litigant seeking to persuade us that there is a reasonable case to be made for the proposition that the intrastate possession of machine guns substantially affects interstate commerce. There is nothing improper or unusual about asking a litigant to point to support for its position, whether in the form of evidence in the record or legislative facts that can be judicially noticed. Such assistance would have been particularly valuable here, since the Executive is in a far better position than we are to determine whether there is a reasonable empirical case to be made for the proposition it is advancing. Without congressional findings or empirical support, it is not possible for appellate judges, who are not experts on firearms, machine guns, racketeering, drug trafficking, or crime in general, to verify in any intellectually respectable way that there is a reasonable case to be made for the proposition that the intrastate possession of firearms substantially affects interstate commerce.