**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John W. KENNEY, Defendant–Appellant.**

No. 95–3937.

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1996.

Decided July 30, 1996.

John W. Vaudreuil (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Thomas J. Coaty (argued), Madison, WI, for Defendant–Appellant.

Before FLAUM, RIPPLE, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

The sole question in this direct appeal is whether John Kenney's conviction for possession of a machine gun is invalid because the criminal statute, 18 U.S.C. § 922(o), is unconstitutional. He argues that the Supreme Court's reasoning in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), demonstrates that § 922(o) exceeds the scope of Congress's legislative power under the Commerce Clause, U.S. Const. Art. I, § 8, cl. 3. The magistrate judge agreed and recommended granting Kenney's motion to dismiss the indictment, but the district court took the contrary view and denied the motion. We affirm the district court.

## I.

The relevant facts are undisputed. In 1991, after receiving a tip from Kenney's wife and her consent to search their Wisconsin residence, an FBI agent recovered an Intratec TEC–9 *semiautomatic pistol* that had been converted to fire as a machine gun. The weapon was testified and operated only in the fully automatic mode. Kenney admitted possessing the weapon and stated that he needed it because of "past dealings in Central America." He later fled the jurisdiction. In 1995 he was arrested in Florida and returned to Wisconsin, where he pleaded guilty to one count of unlawful possession of a machine gun.[1]

## II.

█ Section 922(o) was enacted in 1986 as § 102(9) of the Firearm Owners' Protection Act, Pub.L. No. 99–308, 100 Stat. 449, 452–53, amending the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.* The subsection provides:

(o)(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o). Section 922(o), which took effect on May 19, 1986, regulates more than assembled machine guns: the term "machine gun" is defined as either a weapon that fires repeatedly on a single trigger pull or as a part or parts designed to convert a manually firing weapon into a machine gun. 26 U.S.C. § 5845(b). The Bureau of Alcohol, Tobacco, and Firearms has interpreted § 922(o) to ban private possession or transfer of new machine guns not lawfully possessed before the statute's effective date, and therefore the Bureau will not approve applications to register new weapons because to do so would place the applicant in violation of the law. 27 C.F.R. § 179.105; *see also Farmer v. Higgins,* 907 F.2d 1041 (11th Cir.1990) (agreeing with this interpretation of § 922(o)), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991). Section 922(o), then, effectively freezes the number of legal machine guns in private hands at its 1986 level.

As the Tenth Circuit noted in *United States v. Wilks,* 58 F.3d 1518 (10th Cir.1995), Congress enacted § 922(o) with little discussion: "The scant legislative history merely contains a discussion of an earlier bill proposed in the House of Representatives which 'prohibited the transfer and possession of machine guns, used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime.'"

---

**1.** Kenney entered his guilty plea without preserving his constitutional challenge for appeal. However, the government has expressly declined to raise a waiver argument, citing *United States*

*v. Bell,* 70 F.3d 495, 496–97 (7th Cir.1995) (challenge to constitutionality of statute of conviction is, in certain circumstances, jurisdictional claim not waived by guilty plea).

*Id.* at 1519 (quoting H.R.Rep. No. 495, 99th Cong., 2d Sess. 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1330). The only explanation supplied for the last-minute amendment that was later enacted was "the statement of its sponsor, Representative Hughes, that 'I do not know why anyone would object to the banning of machine guns.'" *Id.* (quoting 132 Cong. Rec. H1750 (1986) (statement of Rep. Hughes)); *see also Farmer,* 907 F.2d at 1044–45; David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective,* 17 Cumb. L.Rev. 585, 670–71 (1987).

■ The standard of Commerce Clause review is narrow and deferential. "Judicial review in this area is influenced above all by the fact that the Commerce Clause is a grant of plenary authority to Congress. This power is 'complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution.'" *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (citations omitted) (quoting *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824)). "The motive and purpose of a regulation of interstate commerce are matters for the legislative judgment upon the exercise of which the Constitution places no restriction and over which the courts are given no control." *United States v. Darby,* 312 U.S. 100, 115, 61 S.Ct. 451, 457–58, 85 L.Ed. 609 (1941). Our task is merely to determine whether Congress could have had a rational basis to support the exercise of its commerce power; and, further, that the regulatory means chosen were "reasonably adapted to the end permitted by the Constitution." *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360; *see also United States v. Wilson,* 73 F.3d 675, 679–83 & n. 6 (7th Cir.1995) (citing *Hodel*), *petition for cert. filed,* 64 U.S.L.W. 3669 (U.S. Mar. 20, 1996) (No. 95–1523). But deference is not acquiescence: consistent with the principle of judicial review set forth in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), it is for the courts to judge whether Congress has exceeded its constitutionally enumerated powers. *Wilson,* 73 F.3d at 680.

In *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court divided 5–4 to strike down 18 U.S.C. § 922(q), which forbade "any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." As this court recently explained:

■ In *Lopez,* the Court determined that in enacting 18 U.S.C. § 922(q), the Gun–Free School Zones Act, Congress had exceeded the "outer limits" of its power under the Commerce Clause. Under the clause, Congress can regulate, the court recounted, three broad categories of activity: the use of the channels of interstate commerce; the instrumentalities of interstate commerce and persons and things in interstate commerce; and activities having a substantial relation to interstate commerce. The latter was the only possible justification for § 922(q).

The Gun–Free School Zone[s] Act failed to survive the constitutional challenge because it was not an essential part of a larger regulation of economic activity and it did not contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. The statute also did not contain congressional findings which would, the Court said, enable them "to evaluate the legislative judgment that the activity in question substantially affected interstate commerce...." —— U.S. at ——, 115 S.Ct. at 1632.

*United States v. Bell,* 70 F.3d 495, 498 (7th Cir.1995). The three categories of commerce regulation outlined by the Court were not new to *Lopez,* but were originally established in *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359–60, 28 L.Ed.2d 686 (1971). *Lopez* addressed only the third category.

The *Lopez* majority acknowledged that "a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty," and that "the question of congressional power under the Commerce Clause 'is necessarily one of

degree.'" *Lopez*, —— U.S. at ——, 115 S.Ct. at 1633 (citation omitted). The majority heeded Justice Cardozo's concern that an overly expansive view of causation "would obliterate the distinction of what is national and what is local in the activities of commerce," *id.* (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 554, 55 S.Ct. 837, 853, 79 L.Ed. 1570 (1935) (Cardozo, J., concurring)), and concluded that to uphold § 922(q) would require the Court "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* —— U.S. at ——, 115 S.Ct. at 1634. But *Lopez* must also be noted for what it did not do. The majority indicated that it intended to establish an outer limit to congressional authority, not to retrench well-established Commerce Clause precedent: "Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further." *Id.; see also id.* —— U.S. at ——, 115 S.Ct. at 1637 (Kennedy, J., concurring). The essential defect of § 922(q), in short, was that the narrow scope of its regulation, limited to prohibiting simple possession of a firearm within a school zone, was a noncommercial local activity that neither was interstate commerce nor, whether taken as a single act or as the aggregate effect of all such acts, had a substantial effect on interstate commerce.

In *Bell*, the appellant argued that the *Lopez* analysis rendered unconstitutional 18 U.S.C. § 922(g)(1), a provision that prohibits the possession of firearms by convicted felons. We readily distinguished § 922(g)(1) because it includes a jurisdictional element requiring the government to prove that the felon "ship[ped] or transport[ed] in interstate or foreign commerce, or possess[ed] in or affecting commerce, any firearm," thus establishing a case-by-case effect on interstate commerce even in prosecutions of intrastate possession. *Bell*, 70 F.3d at 498. Section 922(o), like § 922(q), lacks an interstate commerce nexus element and thus can not be upheld under *Bell*'s analysis. Section 922(o) generally proscribes transfer and possession of machine guns without any reference to interstate commerce. Section 922(o) also, like § 922(q), lacks legislative findings or congressional committee reports regarding its nexus with interstate commerce.

The government argues that § 922(o) is constitutional as part of either the second or third *Lopez/Perez* categories, as a regulation of things in interstate commerce or as a regulation of activities substantially affecting interstate commerce. For support, the government points out that every circuit court to consider the question of § 922(o)'s constitutionality in light of *Lopez* has upheld it: *United States v. Wilks*, 58 F.3d 1518 (10th Cir.1995); *United States v. Kirk*, 70 F.3d 791 (5th Cir.1995), *rehearing en banc granted*, 78 F.3d 160 (5th Cir.1996);[2] and *United States v. Rambo*, 74 F.3d 948 (9th Cir.1996). Kenney counters by citing the contrary pre-*Lopez* view of *United States v. Bownds*, 860 F.Supp. 336 (S.D.Miss.1994).

In *Bownds*, the district court held that § 922(o) exceeded Congress's commerce power and violated the Tenth Amendment. The court faulted Congress for failing either to include a jurisdictional element in the offense or to make findings "to support its authority to ban the mere possession of machine guns." 860 F.Supp. at 340. The magistrate judge in this case found the *Bownds* reasoning persuasive. We have, however, rejected the argument that *Lopez* requires federal criminal statutes to contain a jurisdictional element, *Wilson*, 73 F.3d at 685, and *Lopez* explicitly reaffirmed the rule that "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631. Even in *Perez*, where the Court discussed legislative history at length in the course of upholding a statute that criminalized loan-sharking, the Court was careful to note that such history is merely helpful, not essential, in determining a statute's constitutionality. *Perez*, 402 U.S. at 156, 91 S.Ct. at 1362 ("We have mentioned in detail the economic, finan-

2. The grant of rehearing en banc impliedly vacat-
ed the *Kirk* panel decision. 5th Cir. R. 41.3.

cial, and social setting of the problem as revealed to Congress. We do so not to infer that Congress need make particularized findings in order to legislate."); *see also Katzenbach v. McClung,* 379 U.S. 294, 299, 85 S.Ct. 377, 381, 13 L.Ed.2d 290 (1964) ("As we noted in *Heart of Atlanta Motel* both Houses of Congress conducted prolonged hearings on the Act. And, as we said there, while no formal findings were made, which of course are not necessary, it is well that we make mention of the testimony at these hearings the better to understand the problem before Congress and determine whether the Act is a reasonable and appropriate means toward its solution."). Congress does not confer power on itself by making legislative findings; conversely, it need not make findings to exercise its full enumerated powers.

*Lopez* did establish that, where the legislative history is silent, a substantial interstate commerce nexus must be "visible to the naked eye" without resorting to "pil[ing] inference upon inference" until nothing is left of state autonomy. *Lopez,* —— U.S. at ——, ——, 115 S. Ct at 1632, 1634. The Court was critical of and rejected the illimitable breadth of the loss pooling rationale used to uphold § 922(*o*) in *United States v. Evans,* 928 F.2d 858, 862 (9th Cir.1991), where the Ninth Circuit found a concededly "tenuous" interstate commerce nexus with the machine gun statute by reasoning that firearms are involved in violent crime, the costs of violent crime are substantial, and such costs are spread throughout the population through the mechanism of insurance. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1632 (citing *Evans*). The *Lopez* Court also rejected the government's arguments that guns in schools cause violent crime that reduces the willingness of people to travel interstate, and that guns in schools handicap the education of the citizenry, in turn undermining productivity and interstate commerce. *Id.* Thus if § 922(*o*) is constitutional, it must bear more than a generic relationship several steps removed from interstate commerce, and it must be a relationship that is apparent, not creatively inferred.

The circuit courts have provided several post-*Lopez* rationales for § 922(*o*)'s constitutionality. In *United States v. Wilks,* 58 F.3d 1518 (10th Cir.1995), the Tenth Circuit held § 922(*o*) constitutional under the second category of commerce regulation, that of " 'things in commerce'—i.e., machineguns," reasoning that "[t]he interstate flow of machineguns 'not only has a substantial effect on interstate commerce; it *is* interstate commerce.' " *Id.* at 1521 (quoting *United States v. Hunter,* 843 F.Supp. 235, 249 (E.D.Mich. 1994)). The court found that the legislative history of federal firearms regulation as a whole supported its view that § 922(*o*) regulates "an item bound up with interstate attributes and thus differs in substantial respect from legislation concerning possession of a firearm within a purely local school zone." *Id.*

In *United States v. Kirk,* 70 F.3d 791 (5th Cir.1995), *rehearing en banc granted,* 78 F.3d 160 (5th Cir.1996), a two-judge majority of a Fifth Circuit panel concluded that § 922(*o*) falls into either the first or second category. *Id.* at 795–96. To rebut the appellant's claim that the statute regulates not commerce but "mere possession," the court placed particular importance on § 922(*o*)'s grandfather clause, § 922(*o*)(2)(B), reasoning that in light of the provision "there could be no unlawful possession under section 922(*o*) without an unlawful transfer." *Id.* Therefore:

> In this context, the limited ban on possession of machineguns must be seen as a necessary and proper measure meant to allow law enforcement to detect illegal transfers where the banned commodity has come to rest: in the receiver's possession. In effect, the ban on such possession is an attempt to control the interstate market for machineguns by creating criminal liability for those who would constitute the demand-side of the market, i.e., those who would facilitate illegal transfer out of the desire to acquire *mere possession.*

*Id.* The *Kirk* majority acknowledged that "some of the activity made unlawful is purely intrastate," but found that, as with the federal regulation of controlled substances, there was "a rational basis to conclude that federal regulation of intrastate incidents of transfer and possession is essential to effective con-

trol of the interstate incidents of such traffic." *Id.* at 797.

Finally, in *United States v. Rambo,* 74 F.3d 948 (9th Cir.1996), the Ninth Circuit also upheld the constitutionality of § 922(*o*), finding that it fits into the first category of regulation, that of Congress's power to regulate the use or misuse of the channels of commerce. The court was particularly persuaded by the *Kirk* majority's "market theory" analysis that the structure of § 922(*o*) meant that every unlawful possession would necessarily be preceded by an unlawful transfer. *Id.* at 951–52.

These three decisions agree that Congress had the power to enact § 922(*o*), but their analyses vary as to how the statute comports with *Lopez.* None of the circuits found that *Lopez* applied directly, because none believed that § 922(*o*), unlike the ill-fated § 922(q), was properly viewed in the third category of commerce regulation; and yet the courts differed as to which of the two remaining categories they believed § 922(*o*) belonged.

Although we too hold § 922(*o*) constitutional, we find that the statute is best analyzed in the third category. As an initial matter, § 922(*o*) does not appear to be properly categorized as a regulation of the channels of interstate commerce in the narrow sense of the first category set forth in *Lopez* and *Perez.* The examples used in these decisions indicate that this category is limited to direct regulation of the channels of commerce, for each of the statutes and cases cited, like § 922(g)(1), contains a jurisdictional nexus element. *See, e.g.,* 18 U.S.C. §§ 2312–2315 (interstate shipment of stolen goods); 18 U.S.C. § 1201 (interstate transport of kidnapping victims); *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (regulation of working conditions in the production of goods "for interstate commerce"). The first category thus does little more than justify § 922(*o*) insofar as it regulates interstate transfers and possessions. As the *Kirk* dissent noted, the *Kirk* majority's analysis that every illegal possession would necessarily be preceded by an illegal transfer is not entirely true: an automatic weapon may be created by modifying a semiautomatic weapon with raw materials, *see*

*United States v. Jones,* 976 F.2d 176, 178 (4th Cir.1992) (describing home conversion of shotguns), *cert. denied,* 508 U.S. 914, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993); it may also perhaps result from the effects of ordinary wear and tear on a semiautomatic mechanism, *see United States v. Anderson,* 885 F.2d 1248, 1251 (5th Cir.1989) (en banc); and either an automatic weapon or a conversion kit could be manufactured, transferred, and possessed intrastate. Finally, although it may be true that Congress must regulate intrastate transfers and even mere possessions of machine guns in aid of its prerogative of preventing the misuse of the channels of interstate commerce, the regulation still regulates much more than the channels of commerce. This rationale is therefore an aspect of Congress's broader power to regulate things "affecting" interstate commerce; we must look further, in light of *Lopez,* to confirm the existence of a rational and substantial basis underlying its power to do so.

For similar reasons, § 922(*o*) appears to be an ill fit in the second *Lopez/Perez* category, that of things in or instrumentalities of interstate commerce, because the regulation is much broader than the category. Again, judging from the examples provided by the Court, the second category provides only a partial justification for § 922(*o*). In the *Shreveport Rate Cases [Houston, East & West Texas Railway Co. v. U.S.],* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914) (rate regulation of railroad engaged in interstate commerce), or *Southern Ry. Co. v. United States,* 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911) (regulation of railway safety on interstate lines), cited in *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629, and in 18 U.S.C. § 32 (destruction of aircraft used in interstate commerce), or 18 U.S.C. § 659 (theft from vehicles of interstate shipment), cited in *Perez,* 402 U.S. at 150, 91 S.Ct. at 1359–60, the nexus with interstate commerce is explicit and obvious in each case. The *Wilks* court's observation that "[t]he interstate flow of machineguns 'not only has a substantial effect on interstate commerce; it *is* interstate commerce,' " 58 F.3d at 1521, is correct as far as it goes, but it does not address the different question of the propriety of § 922(*o*)'s regulation of intrastate possession and transfer.

It is true that, unlike § 922(q), which was a limited regulation of firearm possession within discrete and local areas of the states, § 922(o) represents a congressional effort to regulate the whole of an economic activity, the trade in machine guns. Thus it demonstrates a federal purpose of regulating things in interstate commerce, and Congress may regulate to protect or ban things in interstate commerce "even though the threat may come only from intrastate activities." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629. This is not, however, a case of intrastate activity "threatening" interstate commerce, in the way that a railroad maintaining disproportionately low intrastate shipping rates places at a competitive disadvantage and thus directly discriminates against the free flow of traffic over its interstate lines, see the *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914). Permitting unregulated intrastate possessions and transfers of machine guns instead indirectly undermines, via a market theory, the effectiveness of the federal attempt to regulate interstate commerce in machine guns. In other words, the intrastate activity "affects" the interstate commerce, in an attenuated way that raises the *Lopez* concern of whether such effect is "substantial."

And so we arrive at the third category, which, as the district court concluded, provides ample authority for § 922(o). It is evident that the regulation of machine guns is well within the scope of congressional authority over activities affecting commerce, and that § 922(o) is readily distinguishable from § 922(q). First, unlike § 922(q), § 922(o) is recognizable as "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. Kenney's possession of a machine gun is much like the possession of wheat in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), cited with approval in *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630, where the Supreme Court upheld the assessment of a penalty by the Secretary of Agriculture against a farmer, Roscoe Filburn, who harvested twelve acres more wheat than he was permitted to under the Agriculture Adjustment Act of 1938. Although Filburn used the wheat on his farm and did not sell it, the *Wickard* Court reasoned that "even if [Filburn's] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." *Wickard,* 317 U.S. at 125, 63 S.Ct. at 89; *see also Perez* (regulation of local loansharking appropriate where loansharking as a whole supports interstate organized crime). Similarly, there is a rational basis to regulate the local conduct of machine gun possession, including possession resulting from home manufacture, to effectuate § 922(o)'s purpose of freezing the number of legally possessed machine guns at 1986 levels, an effect that is closely entwined with regulating interstate commerce.

Second, again unlike § 922(q), § 922(o) is not a statute that "plows thoroughly new ground and represents a sharp break with the long-standing pattern of federal firearms legislation," and thus the lengthy legislative history of federal firearms regulation does "speak to the subject matter of" § 922(o). *Lopez,* —— U.S. at ——, 115 S.Ct. at 1632 (quoting lower court opinion in *United States v. Lopez,* 2 F.3d 1342, 1366 (5th Cir.1993)). Congress has closely regulated machine guns pursuant to its taxation power since the National Firearms Act of 1934, which subjected machine guns, unlike ordinary firearms, to federal registration and a transfer tax. *Hardy,* 17 Cumb. L.Rev. at 593. The Act was the first major federal attempt at firearms regulation, and it expressly targeted machine guns, a modern weapon whose unusual destructive power was of great appeal to interstate organized crime. *Id.* In considering the bills that became the Gun Control Act of 1968, Congress found that federal control over firearms licensing for dealers, even for intrastate activity, was necessary to address the serious problems associated with interstate trafficking in firearms generally. S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112, 2114, 2168. In light of these findings and enactments, the 1986 addition of § 922(o) was not novel but incremental, merely preventing further growth in the number of machine guns in private hands as an exercise of the historic federal interest in the regulation of

machine guns.[3] As such, and quite unlike § 922(q), deference to Congress's accumulated institutional expertise is appropriate, *see Fullilove v. Klutznick,* 448 U.S. 448, 503, 100 S.Ct. 2758, 2787, 65 L.Ed.2d 902 (1980) (Powell, J., concurring).

In sum, both the nature of the statute and the history of federal firearms legislation support the conclusion that § 922(*o*) is a constitutional exercise of Congress's Commerce Clause power. As the Supreme Court noted in *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992): "As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power." *Id.* at 158, 112 S.Ct. at 2418–19 (citing *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). The possession of a machine gun, because of its relation to the closely regulated interstate market in machine guns, can not be considered purely local or noncommercial. Moreover, the modest regulatory means chosen by Congress were "reasonably adapted to the end permitted by the Constitution." *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360.

### III.

■ Finally, Kenney briefly argues that § 922(*o*) violates the Tenth Amendment by usurping the states' traditional police powers. But *"Lopez* ... did not call into question the well-established principle that Congress may regulate conduct even though that conduct already violates state law." *Wilson,* 73 F.3d at 684. Moreover, the Supreme Court has explained that the Tenth Amendment "is essentially a tautology": the Amendment reit-

erates the federalist notion that the federal government is limited to its enumerated substantive powers and may not invade the exclusive domain of state authority. *New York v. United States,* 505 U.S. at 156–57, 112 S.Ct. at 2417–18. The manner in which Congress acts is similarly restrained: "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.' " *Id.* at 161, 112 S.Ct. at 2420–21 (quoting *Hodel*). Because § 922(*o*) was a proper exercise of Congress's enumerated authority under the Commerce Clause, and because it does not compel, let alone commandeer, the states to do anything, the statute does not violate the Tenth Amendment.

AFFIRMED.

---

3. To the extent, if any, that Congress in enacting § 922(*o*) "pre-empt[ed] the historic powers of the States," the intended scope of the statute is clear and unambiguous and thus satisfies the "plain statement" requirement. *Gregory v. Ashcroft,* 501 U.S. 452, 460–61, 111 S.Ct. 2395, 2400–01, 115 L.Ed.2d 410 (1991). The present case is thus quite unlike *United States v. Bass,* 404 U.S. 336, 349–50, 92 S.Ct. 515, 523–24, 30 L.Ed.2d 488 (1971), where the Supreme Court applied a narrowing construction to an ambiguous gun control statute, former 18 U.S.C.App. I

§ 1202(a), to require the government to prove an interstate commerce nexus in prosecutions for possession of a firearm by a convicted felon. As the *Bass* Court explained: "In light of our disposition of the case, we do not reach the question whether, upon appropriate findings, Congress can constitutionally punish the 'mere possession' of firearms; thus, we need not consider the relevance, in that connection, of our recent decision in *Perez v. United States." Id.* at 339 n. 4, 92 S.Ct. at 518 n. 4 (citation omitted).