**UNITED STATES of America, Appellee,**

v.

**Robert FRANKLYN, also known as Robert Franklin, and Ralph Gonzalez, also known as Raphael Quinones, Defendants–Appellants.**

**Dockets 97–1392, 97–1427.**

United States Court of Appeals, Second Circuit.

Argued April 13, 1998.

Decided Sept. 11, 1998.

Wesley M. Serra, New York City (Brown Berne & Serra, on the brief), for Defendant–Appellant Robert Franklyn.

Mark Diamond, New York City, for Defendant–Appellant Ralph Gonzalez.

Jamie L. Kogan, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Elizabeth Glazer, Assis-

tant United States Attorney, on the brief), for Appellee.

Before: JACOBS and MAGILL,* Circuit Judges, and KORMAN,** District Judge.***

JACOBS, Circuit Judge.

Defendant-appellant Robert Franklyn, having been convicted by a jury of (*inter alia*) unlawfully possessing a machine gun in violation of 18 U.S.C. § 922(*o*)(1) and 18 U.S.C. § 2, challenges the judgment of conviction entered by the United States District Court for the Southern District of New York (Cote, *J.*) on the grounds (i) that the enactment of 18 U.S.C. § 922(*o*) exceeded the Commerce Clause power of Congress because the statute criminalizes the wholly intrastate possession of a machine gun; and (ii) that the prosecutor's use of peremptory challenges violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Defendant-appellant Ralph Gonzalez challenges his sentence on a related charge on the ground that Judge Cote erred in various horizontal and vertical departures from the guideline sentencing range.

## BACKGROUND

Count One of the indictment, filed in December 1996, charged Franklyn with unlawfully possessing a machine gun, in violation of 18 U.S.C. § 922(*o*)(1) and 18 U.S.C. § 2. Counts Two and Three charged Franklyn and Gonzalez (respectively) with possessing ammunition after having been convicted of a felony, in violation of 18 U.S.C. § 922(g) and 18 U.S.C. § 2.

On February 24, 1997, Gonzalez pled guilty to Count Three of the indictment pursuant to a written plea agreement. He was sentenced on July 2, 1997.

Franklyn was convicted following a two-day jury trial in March 1997. The evidence at trial showed the following.

On the evening of March 9, 1996, two New York City Police Department officers on patrol in the Bronx responded to a report that shots had been fired at or near the intersection of 188th Street and Marion Avenue. The police drove up to a group of three men at the intersection (later identified as the defendants and another), and asked if they had heard gunfire. The men pointed south. The police headed south toward another group of people, who pointed back to where the police had encountered the first group, all three of whom were by then walking away quickly, looking back over their shoulders. As the police car reapproached the defendants, one officer spotted Franklyn dropping a duffel bag. The officer picked it up, found a submachine gun inside and yelled "He's got a gun!" whereupon the defendants tried to flee. Franklyn was arrested at once, Gonzalez a few minutes later.

A search of Gonzalez turned up a magazine containing 22 live rounds of .45 caliber ammunition, and four loose rounds, as well as a small amount of cocaine. The gun recovered from Franklyn's duffel was a fully automatic, .45 caliber submachine gun loaded with eight rounds of ammunition. It showed evidence of recent discharge: one spent shell was jammed in the works, and carbon residue was inside the bore. It was stipulated that the ammunition (contained in the gun and recovered from Gonzalez) had moved in interstate commerce.

After the Government concluded its direct case, Franklyn moved pursuant to Fed. R.Crim.P. 29 for judgment of acquittal as to Count One on the ground that § 922(*o*) is unconstitutional for much the same reason that 18 U.S.C. § 922(q) was held unconstitutional in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The district court found that the Government had offered no evidence to show that the machine gun had traveled in interstate commerce, but denied Franklyn's Rule 29 motion on the ground that even in light of *Lopez*,

---

* The Honorable Frank J. Magill, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
** The Honorable Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

*** This matter has been heard by order of the Chief Judge of this Court under 28 U.S.C. § 46(b) certifying a judicial emergency.

§ 922(*o*) was constitutional because "traffic in machine guns is interstate in nature and it has a substantial effect on interstate commerce."

Franklyn testified that he did not possess the duffel bag or the gun, denied that he was with Gonzalez when the police arrived, and identified Gonzalez as the one who had dropped the duffel bag.

The jury convicted Franklyn on both counts, after which Franklyn moved for a new trial pursuant to Fed.R.Crim.P. 33, on the ground that the Government's exercise of its peremptory challenges during jury selection violated *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The district court ruled that Franklyn had waived his *Batson* claim and that the claim would have failed on the merits in any event.

## DISCUSSION

*A. The Constitutionality of Section 922(o)*

■ Franklyn challenges the constitutionality of 18 U.S.C. § 922(*o*), which provides:

(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

  (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

  (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(*o*). Franklyn did not assert as a defense under subsection (2)(B) that he lawfully possessed the machine gun prior to the effective date of the statute.[1] A machine gun is defined as (*inter alia*) "any weapon which shoots, is designed to shoot, or can be

readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845, incorporated by reference into § 922 by 18 U.S.C. § 922(a)(4). This definition encompasses the submachine gun found in Franklyn's possession. *See* 22 C.F.R. § 121.9 (1997).

■ Franklyn argues that the possession component of § 922(*o*) is unconstitutional, and relies entirely on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in which the Supreme Court held that Congress exceeded its power under the Commerce Clause in enacting the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q), which made it a federal crime to possess any firearm within 1000 feet of a school zone. 514 U.S. at 567–68, 115 S.Ct. at 1634.

■ The first inquiry of the constitutional analysis is "whether a rational basis existed for concluding that [the] regulated activity sufficiently affect[s] interstate commerce." *Lopez,* 514 U.S. at 557, 115 S.Ct. at 1629; *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). If so, the "remaining question for judicial inquiry is whether the means chosen by Congress [are] reasonably adapted to the end permitted by the Constitution." *Id.* (citations, internal quotation marks, and brackets omitted).

1. *Sufficient effect.* Seven circuits have addressed the constitutionality of § 922(*o*) since *Lopez* was decided. All of them have found an adequate link between the possession of a machine gun and interstate commerce, although they have differed in rationale. We conclude that § 922(*o*) (unlike the statute in *Lopez* ) regulates activity that may rationally be viewed as substantially affecting interstate commerce.

The *Lopez* Court identified "three broad categories" of activities that affect interstate

---

1. The statutory exception created by § 922(*o*)(2)(B) is an affirmative defense, and the defendant therefore bears the burden of raising it. *See United States v. Gonzales,* 121 F.3d 928, 936–37 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 726, 139 L.Ed.2d 664 (1998); *United*

States v. Gravenmeir, 121 F.3d 526, 528 (9th Cir.1997); *United States v. Just,* 74 F.3d 902, 904 (8th Cir.1996); *see also United States v. Mayo,* 705 F.2d 62, 74 (2d Cir.1983) (noting that defendant has burden of raising affirmative defense)

commerce to a degree sufficient to justify federal regulation.

First, Congress may regulate the *use of the channels of interstate commerce.* Second, Congress is empowered to regulate and protect the *instrumentalities of interstate commerce,* or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those *activities having a substantial relation to interstate commerce, i.e.,* those activities that substantially affect interstate commerce.

514 U.S. at 558–59, 115 S.Ct. at 1629–30 (citations and internal quotation marks omitted) (emphasis added); *see also Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359–60, 28 L.Ed.2d 686 (1971).

The *Lopez* Court quickly disposed of the first two categories of regulable activities described above, determining that if § 922(q) was to be upheld, it could only be "as a regulation of an activity that substantially affects interstate commerce." *Lopez,* 514 U.S. at 559, 115 S.Ct. at 1630.

The Government argued in *Lopez* that possession of a firearm in a school zone often results in violent crime, which affects the national economy by (i) generating costs that burden the population broadly through insurance; and (ii) making individuals less willing to travel to parts of the country that are perceived to be unsafe. *Lopez,* 514 U.S. at 563–64, 115 S.Ct. at 1632. The Court concluded that to accept such an argument would imply that Congress can regulate "not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Id.* at 564, 115 S.Ct. at 1632.

The Government also contended in *Lopez* that guns in schools handicap the learning process and thereby diminish the productivity of the population and the health of the national economy. *Id.* Again, the Court found that under this reasoning, Congress "could regulate any activity that it found was related to the economic productivity of individual citizens." *Id.* The Court refused "to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States," *id.* at 567, 115 S.Ct. at 1634, and struck down the statute:

Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise.... Section 922(q) *is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.* It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

*Id.* at 561, 115 S.Ct. at 1630–31, (emphasis added).

We distinguish *Lopez* on the ground that § 922(*o*), by contrast with § 922(q), is integral to a larger federal scheme for the regulation of trafficking in firearms—an economic activity with strong interstate effects. The structure of the 1986 Firearms Owners' Protection Act ("FOPA"), Pub.L. No. 99–308, 100 Stat. 449 (1986), of which § 922(*o*) is a part, shows how § 922(*o*) fits into the overall regulation of the international and interstate market in weapons deemed particularly dangerous by Congress. Section 922(a) places restrictions on the international and interstate shipment of firearms generally. *See* 18 U.S.C. § 922(a). Section 922(b)(4) forbids the sale or delivery of machine guns by licensed importers, manufacturers, dealers, or collectors, except as specifically authorized by the Secretary of Defense. *See* 18 U.S.C. § 922(b)(4). Section 922(v), which is structured in much the same way as section 922(*o*), bans with limited exceptions the manufacture, transfer, and possession of semiautomatic assault weapons not lawfully possessed prior to the effective date of the statute. *See* 18 U.S.C. § 922(v).

Although § 922(*o*)—like § 922(q) in *Lopez*—lacks the support of specific legislative findings, "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." *Lopez,* 514 U.S. at 562, 115

S.Ct. at 1631; *see also Perez,* 402 U.S. at 156, 91 S.Ct. at 1362 (noting that Congress need not "make particularized findings in order to legislate"); *Katzenbach v. McClung,* 379 U.S. 294, 304, 85 S.Ct. 377, 384, 13 L.Ed.2d 290 (1964) (absence of formal factual findings is "not fatal to the validity of the statute"). Moreover, *unlike* § 922(q), § 922(*o*) is integral to an overall system for the federal regulation of firearms. *Compare Lopez,* 514 U.S. at 563, 115 S.Ct. at 1632 (stating that § 922(q) "plows thoroughly new ground and represents a sharp break with the longstanding pattern of federal firearms legislation") (citation and quotation marks omitted), *with, e.g., United States v. Kenney,* 91 F.3d 884, 890 (7th Cir.1996) (calling § 922(*o*) "not novel but incremental"); *United States v. Wilks,* 58 F.3d 1518, 1521 n. 4 (10th Cir.1995) ("[W]e do not view § 922(*o*) as constituting a 'sharp break' with previous firearms legislation which regulated the interstate flow of firearms."). Accordingly, we can look to the factual findings underlying earlier federal firearm laws. *See United States v. Rybar,* 103 F.3d 273, 281 (3d Cir.1996), *cert. denied,* ⸺ U.S. ⸺, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997) ("The fact that the findings accompanying prior firearms legislation were not reiterated with the passage of § 922(*o*) is not controlling, as evidenced by a long line of Supreme Court cases.") (citing, *inter alia, Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902; *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020); *Kenney,* 91 F.3d at 891 (because of the long history of federal regulation of machine guns, "deference to Congress's accumulated institutional expertise is appropriate").

Those findings demonstrate the effects of traffic in machine guns on interstate commerce and the rational basis for federal regulation of that traffic. In *Rybar,* the Third Circuit discussed the legislative history of federal gun-control laws dating from the National Firearms Act of 1934, Pub.L. No. 474, 48 Stat. 1236, up to FOPA. 103 F.3d at 278–80. *Rybar* concluded persuasively that "[c]ongressional findings generated throughout Congress' history of firearms regulation link both the flow of firearms across state lines and their consequential indiscriminate availability with the resulting violent criminal acts that are beyond the effective control of the states." *Id.* at 279; *see also United States v. Kirk,* 105 F.3d 997, 998 (5th Cir. 1997) (*in banc*) (Parker, *J.,* concurring) (upholding § 922(*o*) in part because "the extensive history of federal firearm regulation and the national scope of § 922(*o*) distinguishes it from § 922(q)"), *cert. denied,* ⸺ U.S. ⸺, 118 S.Ct. 47, 139 L.Ed.2d 13 (1997); *Kenney,* 91 F.3d at 890 ("Congress has closely regulated machine guns ... since the National Firearms Act of 1934, which subjected machine guns, unlike ordinary firearms, to federal registration and a transfer tax."). The legislative history of FOPA focuses on the dangers of interstate traffic in machine guns, emphasizes "'the need for more effective protection of law enforcement officers from the proliferation of machine guns,'" and "describ[es] machine guns as 'used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime.'" *Rybar,* 103 F.3d at 280 (quoting H.R.Rep. No. 495, 99th Cong., 2d Sess., at 2, 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1328, 1330, 1333). *See also United States v. Beuckelaere,* 91 F.3d 781, 785 (6th Cir.1996) ("The legislative history of the FOPA and its predecessors indicates that Congress considered the relationship between the availability of machineguns, violent crime, and narcotics trafficking.") (quotation marks and citation omitted).[2]

**2.** No legislative findings address possession specifically. *See Rybar,* 103 F.3d at 293 (Alito, *J.,* dissenting) ("[T]he question here is not whether the interstate flow of firearms substantially affects interstate commerce; rather, the question is whether the entirely intrastate possession of machine guns has such an effect, and none of the findings noted above speak to that question."). We agree with the *Rybar* majority that

[h]aving attempted regulation through registration and licensing and incrementally extended the coverage of earlier statutes ... it was a natural progression for Congress to decide in 1986 that the growth in crime and destruction caused by machineguns had expanded to the point that justified banning the possession and transfer of post-1986 machine guns.... Congress' intent to regulate possession and trans-

It is clear that Congress intended in FOPA to tighten the regulation of the market for many weapons, and that it intended to constrict sharply the market for certain highly dangerous weapons that (i) are associated with criminal activity and (ii) tend to travel in interstate commerce (thereby thwarting the regulatory efforts of the States). We therefore agree with the Third, Fifth, Seventh and Eleventh Circuits, which have held that Congress had a rational basis for finding that the machine gun trade "substantially affects" interstate commerce.[3] *See United States v. Wright,* 117 F.3d 1265, 1270–71 (11th Cir. 1997), *vacated in part on other grounds,* 133 F.3d 1412 (11th Cir.1998); *United States v. Knutson,* 113 F.3d 27, 30–31 (5th Cir.1997); *Rybar,* 103 F.3d at 282–83; *Kenney,* 91 F.3d at 890–91. We further agree that prohibiting possession of these weapons is a reasonable means of freezing, and ultimately eliminating, the largely interstate market for them.

2. *Reasonable Means.* Section 922(*o*)'s prohibition does not apply to machine guns lawfully possessed prior to the effective date of the statute, May 19, 1986. *See* 18 U.S.C. § 922(*o*)(2)(B). The Bureau of Alcohol, Tobacco and Firearms has interpreted § 922(*o*) to ban private possession and transfer of all new machine guns, plus all existing machine guns that were not lawfully possessed prior to the effective date. *See* 27 C.F.R. § 179.105(a) (1988). The Bureau consequently approves no applications to make, transfer, or import machine guns for sale or distribution, except to government entities. *Id.; see also Kenney,* 91 F.3d at 885. The effect of § 922(*o*), then, is to freeze the number of legally owned machine guns at the level prevailing in 1986. *See Kenney,* 91 F.3d at 885.

We think that this is a reasonable measure for choking off the traffic in machine guns, which may be constricted on the supply side through prohibition of transfers as well as on the demand side by criminalizing possession. "[I]llegal possession of a machinegun cannot occur without an illegal transfer." *Beuckelaere,* 91 F.3d at 784; *see also Rybar,* 103 F.3d at 283 (same). "By regulating the market in machineguns, including regulating intrastate machinegun possession, Congress has effectively regulated the interstate trafficking in machineguns." *United States v. Rambo,* 74 F.3d 948, 952 (9th Cir. 1996).

■ It may be that the possession of a single machine gun is neither interstate in nature nor commercial, but Congress is authorized to regulate individual instances of purely intrastate activity where the cumulative effect of such activity would substantially affect interstate commerce. *See, e.g., Hodel,* 452 U.S. at 277, 101 S.Ct. at 2360; *Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942). The Seventh Circuit held in *Kenney* that "there is a rational basis to regulate the local conduct of machine gun possession … to effectuate § 922(*o*)'s purpose of freezing the number of legally possessed machine guns at 1986 levels, an effect that is closely entwined with regulating interstate commerce." 91 F.3d at 890. The criminal penalty for ownership of the weapons is a marketing impediment to those inclined to violate the prohibition on sale. Accordingly, the statute discourages proliferation of machine guns, as well as unlawful transfer to

fer of machine guns as a means of stemming interstate gun trafficking is manifest. *Id.* at 282.

**3.** It is therefore unnecessary for us to determine whether the activity regulated by § 922(*o*) falls within either of the other two broad categories of activities identified by the *Lopez* Court as being within the scope of the Commerce Clause, as some other circuits have done. *See Wilks,* 58 F.3d at 1521 (holding that because machine guns are commodities which are "transferred across state lines for profit by business entities," § 922(*o*) is "a proper exercise of Congress' power to regulate things in interstate commerce") (internal quotation marks and citation omitted); *Beuckelaere,* 91 F.3d at 785–86 (holding that

"machineguns are 'things in interstate commerce' which flow across state lines for profit by business entities and hamper local and state law enforcement efforts," and, alternatively, that "Congress is regulating the channels of interstate commerce by prohibiting from the introduction into the stream of commerce machineguns manufactured, imported, or otherwise illegally obtained after the effective date of the Act"); *United States v. Rambo,* 74 F.3d 948, 952 (9th Cir.1996) (holding that § 922(*o*) is a regulation of the use of the channels of interstate commerce because "it is 'an attempt to prohibit the interstate transportation of a commodity through the channels of commerce'") (quoting *Lopez,* 514 U.S. at 560, 115 S.Ct. at 1630).

private hands that from time to time have uses for these guns, none of those uses good and virtually all of them criminal.

### B. Franklyn's Batson Challenge

Franklyn, who is African–American, alleges that the Government used three of its six peremptory challenges against three of the four African–American jurors on the panel, and argues that it did so because of their race, in violation of *Batson.*

■ The district court ruled that Franklyn waived his *Batson* challenge because his attorney did not raise it until after *voir dire* had been completed, the challenged jurors had been dismissed, and court reconvened after a lunch recess. As we held in *McCrory v. Henderson,* 82 F.3d 1243, 1249 (2d Cir. 1996), a lawyer must challenge an adversary's use of peremptory challenges *before* the completion of jury selection, in part so that the court can (i) contemporaneously assess the adversary's conduct; and (ii) remedy any improper conduct without having to repeat the jury selection process.

■ Even if Franklyn did not waive his challenge, he would be unable to bear his burden of proving racial bias. Such a *Batson* challenge is typically evaluated in three steps: a prima facie showing that the peremptory challenges were motivated by racial bias; the placing of a burden on the adversary to give a race-neutral explanation for the disputed challenges; and the court's determination as to whether intentional discrimination has been demonstrated. *See Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991); *Batson v. Kentucky,* 476 U.S. 79, 96–98, 106 S.Ct. 1712, 1723–24, 90 L.Ed.2d 69 (1986). Where an explanation is given for the contested challenges and the trial judge rules "on the ultimate issue of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez,* 500 U.S. at 359, 111 S.Ct. at 1866.

The district court here found that the prosecutor exercised her peremptory challenges without discriminatory intent, a finding that may not be disturbed on appeal unless it is clearly erroneous. *Id.* at 369, 111 S.Ct. at 1871. We see no error. The prosecutor offered a reasonable explanation for each challenge exercised against an African–American juror. Franklyn quibbles over a number of these explanations, but these are arguments that were properly addressed to the district court, and were rejected.

■ Franklyn further contends that any *Batson* waiver by his lawyer amounted to ineffective assistance of counsel. But he clearly cannot meet the requirements of *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984), because the challenge is meritless, as the district court found and concluded.

### C. Gonzalez' sentencing

■ In reviewing a district court's sentencing decision on appeal, this Court "accept[s] the findings of fact of the district court unless they are clearly erroneous and ... give[s] due deference to the district court's application of the guidelines to the facts." *United States v. Davis,* 967 F.2d 84, 88–89 (2d Cir.) (citation and internal quotation marks omitted), *cert. denied,* 506 U.S. 928, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992). Disputed facts relevant to sentencing must be established by a preponderance of the evidence, and the sentencing court may rely upon any information known to it. *United States v. Concepcion,* 983 F.2d 369, 387–88 (2d Cir.1992), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993).

■ The sentencing court can depart from the guideline range if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). This Court reviews a district court's decision to depart from the Sentencing Guidelines range for abuse of discretion, *see Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 2043, 2046–48, 135 L.Ed.2d 392 (1996); *United States v. Sprei,* 145 F.3d 528, 533 (2d Cir. 1998); *United States v. Galante,* 111 F.3d 1029, 1034 (2d Cir.1997); *United States v. Rioux,* 97 F.3d 648, 662–63 (2d Cir.1996),

keeping in mind, however, that "[a] district court by definition abuses its discretion when it makes an error of law." *Koon,* 116 S.Ct. at 2047. Because "the abuse of discretion standard includes review to determine that the [court's discretion in the sentencing determination] was not guided by erroneous legal conclusions," *Koon,* 116 S.Ct. at 2048, our review embraces the question of whether a particular factor is a permissible basis for departure. *See Sprei,* 145 F.3d at 533; *Rioux,* 97 F.3d at 663.

Gonzalez pled guilty to possessing ammunition after having been convicted of a felony, in violation of 18 U.S.C. § 922(g) and 18 U.S.C. § 2. At the sentencing on July 2, 1997, Judge Cote settled on a criminal history category of IV and an adjusted offense level of 20, and sentenced him at the top of the resulting 51 to 63 month range because he had attempted to flee when he was arrested. *See* U.S.S.G. § 3C1.1, Application Note 4d (1995). In calculating Gonzalez' sentence, the district court made three separate departures from the Guidelines. Gonzalez challenges each of them.[4]

■ 1. *Base offense level.* The plea agreement and the presentence report ("PSR") recommended a level of 14 on the basis of U.S.S.G. § 2K2.1(a)(6), which specifies a base level of 14 for a "prohibited person" in possession of ordinary guns or ammunition. The district court, however, found that Franklyn's possession of the machine gun was relevant conduct attributable to Gonzalez, and that the applicable guideline section was therefore U.S.S.G. § 2K2.1(a)(4)(B) (1995), which specifies an offense level of 20 if the defendant "is a prohibited person, and the offense involved a firearm described in 26 U.S.C. § 5845(a) or 18 U.S.C. § 921(a)(30)."

The district court did not err in attributing Franklyn's possession of the machine gun to Gonzalez. A base offense level is determined on the basis of, *inter alia,* "all acts and omissions ... aided, abetted ... by the defendant; and in the case of jointly undertaken criminal activity ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during the commission of the offense of conviction." U.S.S.G. §§ 1B1.3(a)(1)(A) and (B) (1995). Judge Cote found that a preponderance of the evidence established each of two separate grounds for attributing the possession of the machine gun to Gonzalez: (i) Gonzalez had aided and abetted Franklyn's possession of the machine gun by carrying ammunition that matched the ammunition found inside it; and (ii) Gonzalez could reasonably foresee, based on his possession of the ammunition, that Franklyn would be carrying the gun. These findings, which are not clearly erroneous, provide adequate support for attribution of the machine gun to Gonzalez for purposes of U.S.S.G. § 1B1.3(a).

■ 2. *Adjusted offense level.* Judge Cote then imposed a three-point vertical departure, bringing Gonzalez' offense level from 20 to 23. The judge stated two independent reasons for this departure. First, she found that the machine gun had been discharged recently in connection with the jointly undertaken criminal activity, and that an upward departure was therefore justified under U.S.S.G. § 5K2.6.[5] Second, she found that the departure was warranted to protect public safety, because the machine gun was possessed "in a high-density residential neighborhood with a long-standing history of violent crime, including death by firearms." (After thus raising Gonzalez' offense level to

---

4. Gonzalez also argues that the enactment of 18 U.S.C. § 922(g), which makes it a federal crime for a "prohibited person" to possess ammunition that has traveled in interstate commerce, exceeded Congress's Commerce Clause powers. But this Court upheld the constitutionality of 18 U.S.C. § 922(g) in *United States v. Sorrentino,* 72 F.3d 294, 296–97 (2d Cir.1995).

5. U.S.S.G. § 5K2.6 states:

If a weapon or dangerous instrumentality was used or possessed in the commission of the offense the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others. The discharge of a firearm might warrant a substantial sentence increase.
U.S.S.G. § 5K2.6 (1995).

23, she lowered it three levels, to 20, for acceptance of responsibility.)

■ The evidence supported the finding that the weapon had recently been fired. The officers were investigating a report of gunshots, the bystanders pointed to the defendants, and the discarded machine gun had a round jammed in its firing mechanism. Gonzalez points to disputed testimony regarding the condition of the gun, but the district court's finding that these facts had been proved by a preponderance of the evidence was not clearly erroneous.[6] The applicable guideline policy statement suggests that a substantial departure may be justified by the "discharge of a firearm." U.S.S.G. § 5K2.6. Therefore, a three-level departure was not an abuse of discretion.[7] We do not reach Judge Cote's alternative ground for this departure.

■ 3. *Criminal history category.* The plea agreement called for a criminal history category ("CHC") of II, as did the PSR, based upon Gonzalez' two prior adult convictions. The district court departed horizontally to category IV pursuant to U.S.S.G. § 4A1.3,[8] because she found that a CHC of II was an "understatement of the likelihood of recidivism and of the seriousness of the defendant's past criminal conduct." The "criminal conduct underlying any conviction that is not counted in the criminal history score" may be considered by the district court in determining whether a departure is warranted. *See* U.S.S.G. § 4A1.2, Application Note

6 (1995); U.S.S.G. § 4A1.3. Examining Gonzalez' record, the district court found three juvenile convictions that had been uncounted because they were remote in time. In February 1988, when he was seventeen years old, Gonzalez was arrested for committing a narcotics-related felony. Before his conviction on that charge, for which he was sentenced to one year in prison, he committed two other crimes. In March 1988, he was arrested for a narcotics-related misdemeanor. In May of the same year, when Gonzalez was still seventeen, he was arrested for carrying a loaded .22 caliber semiautomatic pistol, a felony weapons offense. At the time of this arrest, he was wearing a bulletproof vest and carrying more than $1,500 in cash. He was sentenced to time served for both of these latter crimes.

Application Note 8 to U.S.S.G. § 4A1.2 advises that, in determining whether an upward departure is warranted, the court may properly consider those superannuated convictions that reflect either similar, or serious dissimilar, criminal conduct. U.S.S.G. § 4A1.2, Application Note 8 (1995). Gonzalez' two juvenile felony convictions fit that description and, in combination with his adult offenses, would have placed him in category III.[9] Gonzalez argues chiefly that the district court erred by moving from category III to category IV on the basis of his third juvenile conviction, a misdemeanor that was neither serious nor similar to the offense of conviction. If the district court had made a hori-

6. Gonzalez asserts that the district court should not have used evidence from Franklyn's trial against Gonzalez; this argument is foreclosed by *United States v. Carmona,* 873 F.2d 569, 574 (2d Cir.1989) ("The fact that some material, upon which the trial judge relied, may have had its source in a judicial proceeding in which appellant was not a defendant or represented by counsel does not bar its use.").

7. Gonzalez also argues that the district court engaged in "double-counting" by departing upward on the basis of the same conduct cited to increase his base offense level. Not so: the base offense level was increased because *possession* of the weapon was attributed to Gonzalez, while the adjusted offense level was increased because the weapon had recently been *fired.* Any person hit by a bullet would immediately appreciate the distinction.

8. U.S.S.G. § 4A1.3 authorizes the sentencing court to depart from the guideline range "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3 (1995).

9. Gonzalez contends that the district court should not have considered *any* of his juvenile convictions because the Guidelines enumerate the types of juvenile convictions that may be considered in determining a defendant's baseline CHC. But this argument is foreclosed by *United States v. Nichols,* 912 F.2d 598, 604 (2d Cir.1990) (a case on which the district court explicitly relied), in which this Court held that "lenient juvenile offender treatment" with respect to past offenses, resulting in an artificially low baseline CHC, can justify an upward departure.

zontal departure mechanically or mathematically based on defendant's uncounted juvenile convictions, we would be faced with the question of whether it was permissible to move from category III to category IV on the basis of an outdated conviction that did not fit the criteria in Application Note 8. But the record does not support Gonzalez' characterization.

In gauging the prospects of recidivism, the district court made extensive findings of fact that evince a searching and sympathetic grasp of the defendant's experiences and family circumstances. She cited Gonzalez' lack of any serious educational endeavor or employment record, his history of drug use, and his historical "problem with recidivism" evidenced by his repeated offenses and the fact that he had become a threat to the people in his neighborhood. At the sentencing hearing, Gonzalez explained through counsel that his juvenile delinquency was in part the product of a traumatic youth, including the shooting of his brother, who died in Gonzalez' arms in 1989. Judge Cote observed that Gonzalez' brother was killed shortly *after* Gonzalez had committed the crimes giving rise to his juvenile record in 1988, that Gonzalez' criminal activity continued unabated after his brother's death "at the hands of a gun," and that even that horrific experience was not a "significant enough lesson for the defendant about the problems of possession of a gun and ammunition in New York City." Gonzalez' 1988 conviction for carrying a semiautomatic weapon (while wearing a bulletproof vest and carrying a large amount of cash), for which he received no jail time, prefigured the antisocial conduct that the judge found in this case to be a threat to the community in which the defendant lived.

Based upon her findings, which are amply supported by the record, Judge Cote concluded that a CHC of IV was necessary to achieve a sentence that would incapacitate Gonzalez. As in *United States v. Diaz–Collado,* 981 F.2d 640 (2d Cir.1992), *cert. denied,* 508 U.S. 962, 113 S.Ct. 2934, 124 L.Ed.2d 684 (1993), "the totality of [the defendant's] criminal conduct, revealed in part by the sequence of outdated convictions, persuaded the district court" that a particular CHC "did

not adequately reflect the seriousness of his past conduct or the likelihood that he would commit other crimes. We cannot say that this view was unjustified." 981 F.2d at 644; *see also United States v. Tropiano,* 50 F.3d 157, 163 (2d Cir.1995) (horizontal departure in criminal history category, rather than vertical departure in offense level, was appropriate means of incapacitating twenty-five-year-old defendant who district court found to be a "confirmed recidivist"); *United States v. Kassar,* 47 F.3d 562, 566–67 (2d Cir.1995) (upholding horizontal departure spanning two criminal history categories where district court found that defendant's "conduct demonstrated a definite propensity to commit the crime for which he had previously been convicted" and that he had "flouted [the law], despite being given a benefit once on the exact same criminal conduct") (quotation marks omitted).

■ Finally, Gonzalez contends that the district court erred by departing directly from category II to category IV, in violation of our advice to "pause at each category to consider whether that category adequately reflects the seriousness of the defendant's record." *Tropiano,* 50 F.3d at 162. "[S]o long as the reasons supporting a departure are fully explained, a mechanistic, step-by-step procedure is not required." *Kassar,* 47 F.3d at 566. We think that the district court's findings and reasons are sufficient to demonstrate that this departure was not arbitrary. The court's explanation "informed [the defendant] of the reason for his sentence and provided an ample basis on which we can review the departure." *Id.* at 560.

## CONCLUSION

For the foregoing reasons, the judgments of the district court are affirmed.